**A.F.M. CORPORATION, Plaintiff,**

v.

**CORPORATE AIRCRAFT MANAGEMENT,**
Defendant.

**Civ. A. No. 82–0130–F.**

United States District Court,
D. Massachusetts.

July 26, 1985.

1534

Edward N. Hurley, Springfield, Mass., Philip S. Walker, Dean M. Cordiano, Lynn Anne Glover and David B. Broughel, Day, Berry & Howard, Boston, Mass., for plaintiff.

Daniel R. Coquillette, Jeffrey F. Jones, Palmer & Dodge, Boston, Mass., for defendant.

FREEDMAN, District Judge.

The plaintiff, A.F.M. Corporation ("A.F.M."), has brought this diversity action against the defendant, Corporate Aircraft Management ("C.A.M."), for defamation, interference with a contractual relationship and for unfair and deceptive trade practices as defined in Mass.Gen.Laws ch. 93A, §§ 1, *et seq.* The defendant has counterclaimed for defamation and unfair trade practices. A combined trial was held during which evidence was presented on both the jury (defamation and intentional interference with contract) and non-jury (ch. 93A) issues. After ten days of testimony, the jury reached general verdicts in favor of the plaintiff for defamation and intentional interference with contract and against the defendant on its counterclaim for defamation. The jury returned nominal damages in the amount of $1.00 on the defamation claim and $446,012.00, on the intentional interference claim.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law applicable to the ch. 93A claims.

## I. FINDINGS OF FACT

### A. THE PARTIES

1. The plaintiff, A.F.M. Corporation, is a Massachusetts corporation with a principal place of business in Massachusetts. The corporation is owned by three shareholders, Louis Antos, William Frye, and Robert Moos. Its business consists of flying and maintaining corporate jet aircraft on behalf of their corporate owners. It also provides charter jet service to some of its customers.

2. The defendant, Corporate Aircraft Management, was, at all times relevant to this case, a Texas corporation with its principal place of business in Texas. Charles A. McKinnon is the Chief Executive Officer of C.A.M. This corporation's business con-

sists of providing aviation safety evaluations and consulting services.

## B. BACKGROUND

3. On September 24, 1976, A.F.M. entered into a contract entitled "Flight Management Agreement" with Westvaco Corporation ("Westvaco"), a Delaware Corporation with its headquarters in New York City. The agreement stated that Westvaco would purchase an aircraft and that A.F.M. would be responsible for maintaining the aircraft, providing experienced flight personnel, renting hangar space, and operating the aircraft for Westvaco's exclusive use. In consideration of A.F.M.'s services, Westvaco agreed to pay a fee consisting of a series of fixed and variable costs to A.F.M. A.F.M.'s profit was built into these costs. The Agreement further provided that A.F.M. would "[k]eep, maintain and operate the Aircraft in a proper and careful manner and in accordance with any and all instructions furnished therefore by Westvaco, its insurers or the manufacturer." The Agreement was terminable at will by either party with three months written notice. The Agreement was executed by John Luke, Executive Vice-President of Westvaco (and subsequently its President), and Robert Moos, President of A.F.M.

Shortly thereafter, Westvaco informed A.F.M. that its Board of Directors approved the purchase of a Cessna Citation jet aircraft.

4. Pursuant to the Agreement, on September 29, 1976, Westvaco delivered to A.F.M. its "Corporate Aircraft Policy and Procedure" which was to govern the operation of the Citation aircraft. The document stated that requests for use of the aircraft were to be handled through John Luke's office. In addition, it contained the following pertinent provision:

FLIGHT OPERATIONS. The absolute and controlling operational factor is passenger safety. There is not to be any compromise whatsoever with regard to flight safety, including both equipment condition and operational practice. Whenever any doubt of any type whatsoever arises regarding a proposed flight's safety, the flight is to be delayed.... To this end, the pilot in command has the full and absolute authority and responsibility to assure the safety and conduct of a flight in strict accordance at all times with all governmental regulations and with all Westvaco policy.

This document was amended in minor respects thereafter.

5. From the inception of the A.F.M.-Westvaco contract until the events of 1981 which gave rise to this suit, Westvaco was generally very satisfied with A.F.M.'s operation of its aircraft. The only exception to this was Luke's observation expressed in a January 13, 1981 note to Gerald Hyatt, Vice-President of A.F.M., that the pilots he has been encountering seem to be getting "a good bit younger." This prompted Luke to inquire whether the pilots which had been assigned to fly the Westvaco Citation were "the very best and most able from the A.F.M. pool." He requested Hyatt to send information about the training and experience of pilots who normally flew Westvaco's plane. In response to this, Hyatt wrote a February 6, 1981 letter to Luke enclosing a "list of those A.F.M. pilots you are most likely to encounter acting as pilot in command ... or second in command ... of the Westvaco Cessna Citation."[1]

6. It is clear from the Corporate Aircraft Policy and Procedure document as well as the correspondence between Westvaco and A.F.M., that John Luke and Westvaco insisted upon the safest possible operation of its aircraft and that this desire was communicated to A.F.M.

7. Westvaco's safety concerns were heightened in July 1980 following the crash of a chartered aircraft operated by Hawthorne Aviation of South Carolina in which some of Westvaco's executives were in-

---

**1.** In this letter, Hyatt indicated that the following were the pilots Luke would be most likely to encounter flying the Citation: Gallant, Margolis, Piemonte, Gustafson, Culver, O'Reilly, Pither, Negri, and Bono. The average age of these pilots was 33.77 and they had an average of 5,250 hours of total flight time.

jured. Although A.F.M. was in no way involved in this incident, John Luke decided to retain an aviation safety consultant to review all of Westvaco's flight operations. At this time, Westvaco's flight operations consisted of A.F.M.'s management service and other charter operations which Westvaco had been using.

8. Following consultations with individuals in his corporation and others, including Gerald Hyatt, John Luke selected Corporate Aircraft Management as its safety consultant. By a May 19, 1981 letter, Charles McKinnon was notified of the selection of his firm. A contract was entered into between C.A.M. and Westvaco which provided that in consideration of $15,000, C.A.M. would conduct a safety evaluation of all of Westvaco's aviation operations including the operation of its Citation by A.F.M. As part of this evaluation, C.A.M. would examine operational policies and implementation,[2] flight operations, equipment, aircraft maintenance and organizational safety.[3] Major discrepancies considered critical were to be discussed immediately with Westvaco. Otherwise, a final written report was to be submitted after the completion of the evaluation. Westvaco expressly agreed to indemnify C.A.M. against any claims arising out of C.A.M.'s services.

In notifying McKinnon of his firm's selection, Luke stated in the letter that "passenger safety on a preventative basis is the paramount concern of Westvaco—beyond any other consideration of any type, at any time. Your support in accomplishing this objective is the fundamental reason for our association."

### C. THE SAFETY AUDIT AND PROPOSED CHANGES IN A.F.M. OPERATIONS

9. At the invitation of John Luke, McKinnon met with Luke at Westvaco's offices on June 8, 1981, prior to the commencement of his safety audit. At this meeting, McKinnon asked for and received some of Westvaco's records relating to the operation of its aircraft.

10. Following this meeting, McKinnon drove to Westfield and arrived late in the evening of June 8, 1981. From June 9 through June 12, 1981 McKinnon worked at A.F.M.'s Westfield office. McKinnon had with him several of the documents provided by Westvaco including the list of pilots supplied to Luke by Hyatt. *See supra* at n. 1.

Upon his arrival at A.F.M., McKinnon was given a desk in the office of Craig Culver, the assistant chief pilot. McKinnon had preliminary discussions with Culver, Gerald Hyatt (who was McKinnon's contact person at A.F.M.), Louis Antos, A.F.M.'s Treasurer, and William Frye, the Chairman of the Board. The only top company official McKinnon did not meet during his first visit to A.F.M. was Robert Moos, A.F.M.'s President and Chief Pilot, who was vacationing in Europe.

During these preliminary discussions, McKinnon advised the A.F.M. officials of his evaluation plans and sought the company's cooperation. These individuals expressed their willingness to cooperate by making personnel and documents available for McKinnon.

11. McKinnon's brief meeting with Frye took place when Hyatt was conducting McKinnon on a tour of A.F.M.'s facilities. He was led into a ground floor office containing a Univac computer and a desk at which Frye was working. McKinnon mistakenly thought that this was Frye's office. In fact, this was A.F.M.'s "computer room"; Frye had another desk in his office on the second floor. McKinnon and Frye

---

**2.** "Operation policies and implementation" was to involve nine separate factors including operation manuals, flight and ground crew training and competency review, crew duty and rest time, dispatching and flight control, operations, record, and normal and emergency operating procedures.

**3.** Organizational safety involved management's policy towards safety, organizational structure, employee morale, qualifications and competence of supervisory personnel and contractual relations.

discussed, in addition to the audit plans, Frye's data processing projects for A.F.M. This was the only formal meeting McKinnon had with Frye prior to his last day at A.F.M.

12. McKinnon began his investigation by examining the pilot records of the pilots who flew Westvaco's Citation. Because he found that approximately twenty-seven pilots had flown the aircraft, he effectively examined the records of all of A.F.M.'s pilots.[4] He spoke to some of the present pilots privately (though he was unable to identify any of the pilots by name) about their experience, qualifications, pay, working conditions and morale. During the course of his audit, McKinnon also spoke to some former A.F.M. pilots. McKinnon also examined the maintenance facilities and records and the Westvaco aircraft.

13. As a result of his initial visit to A.F.M., McKinnon reached some preliminary conclusions about A.F.M.'s operations. Upon returning to his Irving, Texas office on June 15, 1981, he called John Luke to report his findings. McKinnon prepared a note to himself prior to this conversation which reflects what he intended to say and most likely did say to Luke. The note contains four numbered items: pilots, record keeping, difficulty in getting adequate records and William Frye.

With regard to the pilots, the note contains criticisms of inadequate training,[5] non-flight duties,[6] insufficient experience, rapid turnover, low pay, and labor problems.[7] The second and third items on the note refer to the inadequacy of A.F.M.'s records relating to the pilot's flight duty and rest times. Finally, with regard to Frye, the note refers to Frye as a "computer amateur nut [who] has Univac in office."

The Court finds that this note accurately reflects the conversation between McKinnon and Luke on June 15, 1981. As a result of this conversation, Luke instructed his secretary not to schedule any further flights on the Citation until further notice.

14. The statement about William Frye being a "computer amateur nut" was the subject of a good deal of testimony at trial. Mr. McKinnon testified that he intended the remark as a compliment to Frye's interest in computers and data processing improvements for A.F.M. The plaintiff urges, in contrast, that the statement was intended as criticism of Frye and, to the extent that he was the Chairman of its Board of Directors, a criticism of A.F.M. generally. The Court finds that McKinnon's characterization of this remark as a term of admiration is not credible. When asked why, though he found A.F.M.'s maintenance operations to be satisfactory, he did not tell this to John Luke during this telephone call, McKinnon responded that he believed his agreement with Luke required him to report immediately only on discrepancies that affected safety and not to give status reports on things done properly. Accepting this description of his responsibility to provide interim reports to Luke as true, McKinnon's reference to Frye as a "computer amateur nut" must have been intended by its speaker as reflecting a fairly serious discrepancy in A.F.M.'s operations.

Upon receiving this telephone call from McKinnon, Luke told him that he wanted to discuss McKinnon's preliminary findings in person at Westvaco's New York offices.

15. The next step in McKinnon's audit was his visit to the National Transportation Safety Board in Washington, D.C. on June 17 to check the agency's records of A.F.

---

**4.** The testimony indicates that in 1981 A.F.M. had approximately thirty-one pilots on staff.

**5.** The note contains the following observations about the pilot training at A.F.M.: "no real, formal training," "no simulator time," and "all in-house flight and ratings."

**6.** Pilots at A.F.M. were required in 1981 to tow the plane from the hangar onto the runway and

to clean and fuel the aircraft. In this note, McKinnon refers to two accidents in the preceding year involving the pilots towing the Westvaco Citation.

**7.** McKinnon reported that all pilots were unhappy, had filed written reports, and were in the process of starting a union.

M.'s pilots who had flown the Citation during the previous twelve months. The only negative information he uncovered about A.F.M.'s pilots was a violation by Peter T. Piemonte, who, while acting as pilot in command, flew through a prohibited zone in Washington, D.C. A civil penalty of $1,000 was assessed but it was administratively settled for a $200 fine.

16. On June 18 McKinnon flew as a passenger on the Westvaco Citation from Washington to New York to meet with John Luke. At this meeting McKinnon reiterated the criticisms he made during the June 15 conversation with respect to inadequate training of pilots, poor pay, high turnover, labor disputes, and added that A.F.M. did not operate under any standard operating procedures. McKinnon and Luke also discussed various changes that could be made in the manner of A.F.M.'s operation of Westvaco's aircraft to remedy the discrepancies McKinnon identified.[8]

17. Following his meeting with John Luke, McKinnon flew to Westfield to continue with his safety audit. During this second visit to A.F.M., McKinnon spoke to additional pilots and met Robert Moos, A.F.M.'s President and Chief Pilot, for the first time. McKinnon apprised Moos and Hyatt of his preliminary findings. Moos testified that he was quite surprised as he had thought that Westvaco was satisfied with A.F.M.'s operations. McKinnon telephoned Luke who instructed him, over McKinnon's objections, to give A.F.M. a copy of his handwritten preliminary findings.

McKinnon agreed with Moos and Hyatt to meet on June 19 at John Luke's office in New York.

18. Because of an apparent misunderstanding, no preliminary meeting took place among McKinnon, Hyatt and Moos prior to their joining Luke for a plenary meeting as McKinnon had planned. The purpose of this "pre-meeting" was to discuss McKinnon's proposed changes in A.F.M.'s operation of the Westvaco Citation. Nevertheless, a meeting did take place among McKinnon, Hyatt, Moos and Luke on June 19. At this meeting, McKinnon's preliminary findings were discussed along with the proposed changes in A.F.M.'s operations.

19. McKinnon presented a document entitled "Memorandum of Understanding Regarding Contract Operation of Westvaco's Citation 500 N. 341CC Between A.F.M. and Westvaco" at this meeting. This document contained McKinnon's suggestions of new guidelines which A.F.M. should adopt for the management and control of Westvaco's aircraft. Included in the Memorandum were requirements for a dedicated crew (a pilot and copilot who were to fly only Westvaco's plane and no others); increased training for the crew including the use of simulators; maximum flight, duty and rest time limitations; increased crew pay; revised operations manual and a monthly reporting requirement. This agreement was not signed at the meeting. Instead, McKinnon, Luke, Moos and Hyatt agreed that McKinnon would return to A.F.M. and further refine these guidelines.

20. McKinnon's behavior at this meeting was the subject of extensive testimony at trial. He states that he was perhaps "heated" and interrupted Hyatt and Moos repeatedly. Moos and Hyatt describe McKinnon as being "upset" at A.F.M.'s defense of its operation. Whatever McKinnon's conduct may have been, McKinnon felt compelled to telephone Luke on June 23 to apologize for his behavior at the meeting.

---

8. The proposed changes that were discussed included having a dedicated crew assigned more or less permanently to fly the Westvaco plane; training for this dedicated crew every six months; establishing firm policies on the extent of crew duty and rest times; and development of a new A.F.M. Operations Manual.

The proposed changes that were discussed during this meeting were largely incorporated into the Memorandum of Understanding negotiated between A.F.M. and McKinnon which was to govern A.F.M.'s operation of Westvaco's Citation under a new contractual arrangement. *See* discussion, *infra* at ¶ 19.

21. During the several weeks following this meeting, McKinnon returned to A.F.M. and worked with the A.F.M. management to conclude an agreement for new guidelines to govern the A.F.M.-Westvaco contract.

22. On July 1, 1981, McKinnon, Moos and Hyatt met at A.F.M. to discuss the composition of the dedicated crew. It was agreed that Craig Culver and Charles Yenian would be the dedicated pilots and Bryan O'Reilly and Mike Kohut, the dedicated co-pilots. In addition, they agreed to increases in the crew's salary and to send the pilots to a training program at Flight Safety International ("F.S.I.") in Wichita, Kansas prior to their assignment to the contract.

23. As a result of the new conditions contained in McKinnon's Memorandum of Understanding, Westvaco would have been responsible for substantial increases in its annual costs for operating the aircraft (and corresponding increases in A.F.M.'s profits). Westvaco was also to bear the full cost of the increased training for the dedicated flight crew which was estimated to be $38,700 for the first year and $14,854 for subsequent years.

24. Although Luke expressed doubt as to whether he would have proceeded to finalize a new contract with A.F.M. in light of McKinnon's preliminary criticisms, the Court finds that at this stage Luke would have concluded the agreement with A.F.M. This conclusion is supported by the fact that Westvaco agreed to pay $38,700 for the simulator training at F.S.I. for the dedicated crew even though no final agreement had yet been reached with A.F.M.

25. The four dedicated pilots attended the F.S.I. program during mid-July 1983. On July 13–14, McKinnon flew to Wichita and observed the pilots' training and found it satisfactory.

26. During the period in which McKinnon was working with A.F.M. management to develop improved operating procedures, the latter drafted a document dated July 1981 entitled "Corrections and Amplifications to the Corporate Aircraft Management, Inc. June 1981 Westvaco/A.F.M. Report." This document, referred to during the trial as the "Rebuttal," was sent to John Luke on July 17, 1981. It was intended by its authors, principally Gerald Hyatt, Robert Moos and Louis Antos, to refute the criticisms of its operation contained in McKinnon's Preliminary Report. It is this document which constitutes the central basis for the defendant's counterclaim against A.F.M. for unfair and deceptive business practices.[9]

27. On July 23, 1981, Moos, Hyatt and McKinnon had their third meeting with Luke at Westvaco's New York offices. The ostensible purpose of this meeting was to "wind up" the discussions about the new policies. This was not accomplished primarily because of the somewhat strained atmosphere at the meeting which was accounted for by two factors: first, there was confusion as to whether Moos and Hyatt had been "disinvited";[10] and second, it was the first opportunity that McKinnon had to hear about the A.F.M. rebuttal document. In any event, Luke felt that additional discussions were necessary. Consequently, McKinnon returned to A.F.M. to meet with its management on July 24, 1981.

28. Three meetings took place at A.F.M. on July 24. During the first meeting a basic agreement was reached among Hyatt, Moos and McKinnon. The agreement took the form of another draft of the Memorandum of Understanding which was referred to at trial as the "Cut and Paste" version. This document consisted of a ser-

---

**9.** The Rebuttal will be discussed more extensively below. *See infra,* ¶¶ 50–55.

**10.** It had originally been planned that all four principals to these discussions attend the meeting. Subsequently, however, Luke told McKin-non that he would prefer meeting privately without A.F.M. representatives being present. The rescinding of Luke's invitation apparently never reached Hyatt and Moos.

ies typed paragraphs taken from McKinnon's preliminary report stating a criticism of A.F.M.'s operations followed by handwritten sentences consisting of the proposed solution to the deficiencies. These portions are mostly in McKinnon's handwriting. The memorandum required A.F.M. to adopt and be governed by a new flight operations manual, outlined the training of the dedicated crew, mandated flight duty and rest times including the requirement of monthly reports so that A.F.M.'s compliance could be measured, and stated that Craig Culver would be appointed as Chief Pilot for A.F.M.'s Citation flight operations. In that capacity, Culver was to have the responsibility and authority "to control the safety and effectiveness of the operation of Westvaco's and other Citation aircraft operated by A.F.M."

The report concludes with this observation:

> It is C.A.M.'s opinion that A.F.M. is capable of meeting Westvaco's requirements to prove a quality of operation that is "equal to or better than scheduled airline safety."

> A.F.M. management has made the required changes in their operating procedures and management. They have agreed to provide the reports and pilot data required to show compliance with the Westvaco contract.

> It is C.A.M.'s recommendation that Westvaco sign a contract for a six-month trial to determine A.F.M.'s capability to perform under the terms of this agreement.

29. A second, briefer meeting took place later that morning. At this meeting, Hyatt, Moos and McKinnon were joined by Frye and Antos to review the progress made at the early meeting. There was very little disagreement about the terms of the Memorandum, and the only changes made were very minor.

30. The third meeting was between McKinnon and Frye and had been at the former's request. McKinnon wished to receive the assurances of A.F.M.'s chief executive officer before recommending to Luke that the A.F.M. contract should be renewed. Another reason for this requested meeting was to discuss Frye's appointment as A.F.M.'s chief pilot. McKinnon had learned of this earlier that day from a notice pinned to the A.F.M. pilots' bulletin board.

31. By all accounts the third meeting, lasting only a few minutes, was very acrimonious. McKinnon expressed his disagreement with Frye for his appointment as chief pilot, thinking him unqualified to occupy the position due to his lack of credentials and his other duties as A.F.M.'s Chairman of the Board and director of data processing operations. Frye strongly defended his appointment.

32. McKinnon left this meeting with grave doubts about A.F.M.'s ability and willingness to implement the changes contained in the Memorandum of Understanding. He thought that if Frye, A.F.M.'s chief executive officer, was personally hostile to the changes McKinnon had proposed, the likelihood that A.F.M. could be counted on to proceed to "reform" its operation was very poor. McKinnon conveyed these doubts to Luke in a telephone call on July 27. He told Luke that it was his impression that Frye and A.F.M. did not understand the "failures" in their performance under the prior Westvaco contract and that it had become apparent that A.F.M. would "agree to any proposal from Westvaco and then continue on [its] own way."

The same day, McKinnon wrote a letter to Luke enclosing what he described as "C.A.M.'s documentation of [its] attempt to reach an understanding with A.F.M. management...." He states that in his discussions with Frye, it became clear to him "that the management of A.F.M. did not understand the past shortcomings regarding their performance under the Westvaco contract." McKinnon expressed his conclusion that "without a major change in

the attitude and direction of the top management—there is little chance that A.F.M. can perform to Westvaco's satisfaction.[11]

33. By a letter of September 18, 1981, John Luke gave notice to A.F.M. of Westvaco's decision to terminate its flight management agreement and requested a final statement of costs. The agreement expired three months after the notice in December 1981. Luke, in consultation with McKinnon, directed that Westvaco's Citation be relocated to another corporate aircraft management company in New Jersey in the fall of 1981.[12] On December 12, 1981, A.F.M. issued its final invoice to Westvaco and with its payments, the contractual relationship between Westvaco and A.F.M. came to an end.

## D. PRELIMINARY REPORT

34. In early July of 1983, Luke instructed McKinnon to reduce his preliminary conclusions to writing. Although it was not his usual practice to make a written preliminary report, McKinnon complied and drafted a document entitled "Evaluation of Westvaco's Use of Aircraft for Travel on Company Business (Preliminary Report) (A.F.M. Contract)" dated June 1981. The document was sent to Luke on June 29, 1983. This report will be referred to hereinafter as the Preliminary Report.

35. The evidence establishes that McKinnon transmitted two copies of the Preliminary Report—one to Luke and the second to A.F.M. McKinnon resisted sending a copy to A.F.M., but after Luke insisted that they be shown his findings, McKinnon complied.

36. The Preliminary Report contains the specific statements which the plaintiff contends[13] constitute the defamation of A.F.M. and which form one of the bases for the ch. 93A claim. These statements will be analyzed individually.

### (1) Violations of Federal Aviation Administration Regulations

37. The Preliminary Report contains statements to the effect that A.F.M. violated Federal Air Regulation ("F.A.R.") Part 135 with respect to crew duty and rest time requirements. Much testimony was introduced at trial on the question of what pertinent federal regulations governed the operation of the Citation. There are two sets of regulations that arguably could control the operation of the aircraft—F.A.R. Parts 91 and 135. In several respects Part 135 is much more stringent than Part 91. For example, F.A.R. Part 135 contains provisions concerning pilot training and proficiency checks, crew flight and duty time, weather minima and record keeping that are either absent from or much more liberal in Part 91.

The determination of which regulation governs a particular flight depends on whether the company for whom the plane

---

**11.** McKinnon enclosed a typed copy of the "Cut & Paste" memorandum which differed from the version discussed at A.F.M. on July 24 only in its conclusions regarding A.F.M.'s organizational structure ("CAM has serious reservations" regarding Frye's assumption of the duties of Chief Pilot), and contractual relations. Of the latter, McKinnon wrote:

> A.F.M.'s letter to Westvaco ... and the enclosed [Rebuttal indicate] that A.F.M. management does not understand or admit to any of the deviations from safe operational practice and contractual obligations. A.F.M. management has not accepted the fact that substantial and serious deviations were made from the letter and spirit of the Westvaco/AFM contract. Under this condition we [C.A.M.]

have reservations concerning A.F.M.'s dedication to performing under any new contract without monitoring of performance. Such a close monitoring system is not practical or desirable.

**12.** McKinnon received no additional compensation for his services in relocating the Citation to New Jersey.

**13.** The Court focuses on these particular statements as they have been identified by the plaintiff and its counsel in the complaint, the counsel's closing argument, and in its Proposed Findings of Fact and Conclusions of Law.

is flown owns any planes of its own. When a corporation does not own its own plane, but charters planes from airlines or corporate aviation companies, the plane must be operated in conformance with F.A.R. 135. However, if a corporation owns its own plane but another company maintains and operates the aircraft, the plane's operation need only meet Part 91 requirements. As a matter of law, A.F.M.'s operation of Westvaco's Citation was governed by F.A.R. Part 91.

38. In the Preliminary Report, McKinnon makes clear that Part 91 was the only *mandatory* federal regulation which governed the Citation's operation. Nevertheless he states, "[i]n our review of the Westvaco/A.F.M. contract and other communications with A.F.M., we find that Westvaco has directed that their airplane be operated under F.A.R. 135 regulations." A.F.M. concedes that it agreed to operate the Citation with Part 135 as a "principled guideline," but not as a mandatory regulation.

The Court concludes, however, that although Part 135 did not legally regulate the operation of the plane, Westvaco and A.F.M. had agreed that Part 135 should control *as if it were* the applicable mandatory federal regulation. Regardless of what A.F.M. might have believed, for purposes of defamation what is relevant is what the recipient of the allegedly defamatory statement understood by it. In this regard, the Court notes that the person who was in the best position to know what regulations were to be applicable was the recipient of the communication, John Luke. Luke testified that it was his understanding that Part 135 was to control.

■ 39. McKinnon noted five specific violations of F.A.R. 135 involving pilot flight and duty times. F.A.R. 135 requires that a pilot must receive at least ten consecutive hours free of all duty within a twenty-four hour period. The five events listed contain off-duty periods ranging from 6 to 7.9 hours within a twenty-four

hour period. Having reviewed the flight records relative to these incidents, the Court finds McKinnon's statement of off-duty hours to be mostly accurate. The Court further finds that McKinnon's characterization of these incidents as "violations" is neither false nor defamatory given the instruction Luke had given A.F.M. regarding the applicability of F.A.R. 135.

### (2) Operations Not Under Any Established Policy

■ 40. In the context of operational manuals and related documents, McKinnon wrote: "A.F.M. does not operate the Westvaco airplane under any established policy." Although McKinnon may not have thought them adequate, the evidence is clear that A.F.M. did operate the Citation under the policies contained in the Westvaco Corporate Aircraft Policy and Procedure and the amendment thereto, *see supra* ¶ 4, at 3. It is uncontradicted that a copy of these documents was located on the Citation during its operation and that the pilots who flew the plane were generally familiar with them and adhered to their dictates.

A particular incident demonstrates the inaccuracy of McKinnon's statement that A.F.M. did not operate the Citation under any established policy. In a July 31, 1980 letter, John Luke expressed his company's concern over the dangers posed by butane lighters. He inquired whether it would be possible for A.F.M. pilots to insure that no Westvaco passengers carry butane lighters on board the flight. One week later, Craig Culver, A.F.M.'s Assistant Chief Pilot, issued a memorandum to all flight crew members directing that they not carry butane lighters aboard any A.F.M.-operated aircraft and "make every effort to insure that no passenger is boarded with a butane lighter on or about his person." Clearly, A.F.M. operated its flights under at least *some* established policies.

41. The Court finds that this statement was false and defamatory in that it tended to prejudice A.F.M. in the conduct of its

business and deter Westvaco from dealing with it.

### (3) Lack of Jet Simulator Training

■ 42. McKinnon wrote, "We did not talk to a single pilot who was assigned to the Westvaco contract who had ever received jet simulator training." The plaintiff suggests that while this statement may literally be true (e.g., if McKinnon did not talk to any pilots this statement would be true even if all of A.F.M.'s pilots had jet simulator training), the statement was meant to convey, as innuendo, that none or very few of A.F.M. pilots had received this type of training. A review of the records of the ten pilots who flew the Citation over ninety percent of the time between October 1976 and July 1981 indicates that seven had received some simulator training. It might seem that McKinnon's statement is at least misleading. However, the context of the statement is A.F.M.'s training policy and it is true that at the time of McKinnon's visit, all of its personnel were being trained in house without jet simulation of the Citation aircraft. Given the context of the remarks, I do not find the statement to be sufficiently misleading as to constitute a defamatory falsehood.

### (4) Inadequate Pilot Experience

■ 43. The Preliminary Report expressed concern about the inadequate experience of the pilots. McKinnon wrote "[a]lmost every one of these pilots [those who flew Westvaco's Citation] were brought into A.F.M. with minimum total flying experience and little or no jet experience." In addition, McKinnon stated "A.F.M. has made a practice of hiring low time local pilots. Very few of the pilots hired in the last two years have had any jet flight experience other than the few hours required to get a rating under the GI Bill."

From a review of the evidence, the Court finds that these statements were false and defamatory. Pilot experience can best be measured by the number of hours of flight time in various types of aircraft. While no clear evidence was introduced at trial as to what may constitute an "adequate" level of experience, the pilots who flew the Westvaco plane certainly had more than "minimum flying experience" and were not "low time local pilots." The four pilots who flew most often as pilots-in-command from May 1980 to May 1981, had an average of 4,243 total flying hours and 1,084.5 flying hours in Cessna Citation jet aircraft by May of 1981.

### (5) Lack of Management Interest in Record Keeping

■ 44. McKinnon criticized A.F.M. for not maintaining sufficient records to keep account of whether their pilots had exceeded duty and rest time requirements or guidelines. McKinnon remarked, "We can only contribute [sic] a lack of management interest in this vital function as the reason A.F.M. pilots are frequently violating established regulations." The Court finds this remark to be a non-defamatory expression of opinion founded on the disclosed non-defamatory assertions of fact.

F.A.R. Part 135 includes a much more comprehensive record keeping duty for plane operators than does Part 91. In conducting his audit, McKinnon found it difficult, if not impossible, to determine whether the A.F.M. pilots received the required ten hours of consecutive off duty time because no single record established what a pilot might have done either before or after Westvaco flights. For example, if a pilot went off duty at 1:00 a.m. from another customer's flights, and at 6:00 a.m. that morning, began to fly a series of flights for Westvaco, the records available to McKinnon would only disclose the Westvaco flight duty hour and not the fact that the pilot had violated Part 135 standards because he did not have sufficient off-duty hours between the Westvaco and the other customer's flights.

McKinnon stated that the Univac computer under use at A.F.M. when he con-

ducted his visit could easily have been programmed to keep track of the rest and duty times.[14] In fact, the A.F.M. management misrepresented to John Luke a set of computer print-outs as actual documents regularly used by A.F.M. to track each pilot's flight and duty times. Evidence at trial clearly established that these reports were not actual records but merely "experimental" output of Frye's data processing efforts. The fact that the A.F.M. management made these false misrepresentations to Westvaco can be taken as an admission of their lack of interest in accurate and legitimate record keeping.[15]

### (6) A.F.M.'s Refusal To Give Pilots Required Recurrent Training Unless They Signed a Repayment Agreement

45. During his audit at A.F.M., McKinnon discovered that a majority of the A.F.M. pilots had been involved in a labor dispute with management. A major part of that dispute was a plan, developed by A.F.M.'s corporate treasurer, Louis Antos, which he named the Personal Education Program ("PEP"). Antos described this plan as follows: The pilots who flew A.F.M.'s relatively less complex aircraft (i.e., the Citation), were always clamoring to be trained to fly more complex planes, in part so they could receive higher salaries. However, A.F.M. did not have the need for that many pilots with the greater degree of training and feared that if it provided the pilots with the upgrade training, the pilots would leave A.F.M. and seek jobs elsewhere armed with the additional training. According to Antos' testimony, his PEP plan would provide the upgrade training to the pilots in return for their agreeing to repay a portion of the cost of the training if they left A.F.M. within twenty-four months following their training.

On January 26, 1980, several of the pilots wrote to Robert Moos opposing the PEP plan. The letter stated, "We reject any and all attempt [sic] by company management to sign any individual or collective contract agreeing to any incurred debt payable to A.F.M. for completion of any training; to include ground school, simulator or flight training in any aircraft for any reason whatsoever." As a result of this strong opposition, the plan was never implemented.

46. While no pilot was required to repay any of his training costs as a result of the PEP plan, there were instances in which some of A.F.M.'s pilots had to pay part of the cost of training out of their pockets. For example, a former A.F.M. pilot, Stephen T. Kilbourne, testified that ninety percent of the cost of his training for the Learjet at the Danbury School of Aviation was paid for through his veterans' benefits. Although Moos promised that A.F.M. would pay the balance, it never did and Kilbourne had to pay approximately $478.00 out of his own pocket.[16] Another former A.F.M. pilot, Phillip Boiven, also had to pay the ten percent of the cost of training which veterans' benefits did not cover.

■ 47. Nevertheless, the Court finds that McKinnon's statement that "A.F.M. requires [its pilots] to obtain their jet airplane ratings at their own expense," is an overstatement in that it implies that *all* training was paid for by the pilots when in fact A.F.M. paid for most training expenses. Hence, this statement is defamatory of A.F.M.

### (7) William Frye and Nicholas Cardwell Flew the Westvaco Citation Though Not Currently Qualified

■ 48. In the Preliminary Report, McKinnon wrote that among the twenty-

---

**14.** McKinnon was qualified to make this judgment based on his experience at C.A.M. in designing and marketing computer software for the aviation industry.

**15.** *See also* discussion of C.A.M.'s counterclaim, *infra* at ¶ 54.

**16.** Although it is probably correct, as plaintiff suggests, that this sum was a tax deductible expense for Kilbourne, this hardly establishes the falsity of McKinnon's statement—that pilots had to contribute financially to their own training.

eight pilots who had flown on Westvaco flights in the year preceding his audit were A.F.M.'s Chairman of the Board, William Frye, and its attorney, Nicholas P. Cardwell. Of these two men McKinnon stated:

> A review of their recent flying experience indicates that neither of them could be considered as currently qualified on the Citation at the time that they serve[d] as crew members. While the use of such pilots as second in command may meet the legal requirements of F.A.R. Parts 91 and 135, we do not feel that Westvaco would agree to this type of substitution if they had been informed of the facts.

The terms "current" and "qualified" have specialized meanings in the aviation community. Qualified means that the pilot has received an official certificate or license to fly a particular type of aircraft. In this sense, both Frye and Cardwell were "qualified" to fly the Cessna Citation. Being current refers to the legal requirement of a pilot to perform minimum numbers of takeoffs and landings each month. While McKinnon admitted that he did not have direct evidence that Frye and Cardwell had, in fact, allowed their "landings to lapse," he did suspect this to be the case because of each of their non-piloting responsibilities. In addition, the plaintiff has offered no evidence that McKinnon's statement was false. Accordingly, as the plaintiff has not proven this statement to be false, the Court finds the remark is not defamatory.

### (8) Preliminary Report in General

49. In addition to the remarks mentioned above which have been characterized as misstatements, the Preliminary Report contains other, generally minor, inaccuracies such as the statement that Gerald Hyatt was the pilots' intermediary with the A.F.M. management; in fact, it was Robert Moos and Craig Culver with whom the pilots most often dealt. Overall, however, the Court finds that the Preliminary Report

contains accurate factual statements and well-founded opinions about A.F.M.'s operations.

### E. A.F.M.'S REBUTTAL TO THE PRELIMINARY REPORT

50. As has been mentioned, A.F.M. responded to C.A.M.'s Preliminary Report by sending a document entitled "Corrections and Amplifications to the Corporate Aircraft Management, Inc., June 17, 1981 Westvaco/A.F.M. Report" ("Rebuttal") to John Luke on July 17, 1981. The document was written by Gerald Hyatt in consultation with the other A.F.M. managers and is arranged in numbered paragraphs and sections to track McKinnon's Preliminary Report.

51. The defendant in its counterclaim alleges that the Rebuttal contains several false or misleading assertions that tend to imply that McKinnon's Preliminary Report was itself false and that C.A.M.'s safety audit was not competently performed. Thus, C.A.M. asserts that these statements were defamatory of it and constitute unfair or deceptive trade practices in violation of Mass.Gen.Laws ch. 93A, §§ 1, et seq. The defendant points to several specific statements contained in the Rebuttal that it alleges underlies its counterclaim. The Court will discuss only those which are colorably defamatory of C.A.M.:

### (1) No Pilot was Required to Obtain Training at His Own Expense

52. As discussed above, *supra* at ¶¶ 45–47, this statement is inaccurate in that at least some pilots had to pay the ten percent cost of some training which their G.I. benefits did not cover. By and large, however, the Court finds that this is not a material misstatement because it appears from the evidence that A.F.M. provided the large majority of pilot training at its own expense.

### (2) Pilot Recurrent Training with Simulators

53. The Rebuttal states that "[u]ntil 1980 all A.F.M. pilot in command ... recur-

rent training was performed annually at Flight Safety International ..., and included simulator training." As mentioned above, *supra* at ¶ 42, of the pilots who flew the aircraft most frequently between 1976 and 1981, some had received no jet simulator training on the Citation prior to 1980. The Court finds this statement to be inaccurate and misleading.

### (3) Readily Available Documents from which Compliance with Flight Duty and Rest Time Requirements Could be Ascertained

54. Hyatt wrote that there were three readily available documents which would indicate each pilot's flight and duty times and attached copies of each. As discussed above, *supra* at ¶ 44, the testimony clearly established that these documents were, in fact, never in use at A.F.M. but were merely experimental computer output bearing no relation to A.F.M.'s actual operations. The Court finds this statement to be misleading.

### (4) Successful Federal Aviation Administration Audits of A.F.M.'s Operations

55. The Rebuttal states: "The FAA [Federal Aviation Administration] audits A.F.M. pilot flight and duty times regularly without any problems obtaining the necessary information. A.F.M. has never received a violation from the FAA for any reason, including violation of flight and duty time regulations." While this statement may be true literally, it is nonetheless misleading because, as Mr. Moos testified, A.F.M.'s Part 91 operations (of which Westvaco's flights were legally a part) were not subject to F.A.A. scrutiny. It was deceptive, therefore, for Hyatt to write that the F.A.A. had never found any flight duty and rest time violations because it had no occasion to review A.F.M.'s Westvaco flight record.

## F. FACTUAL CONCLUSIONS

### (1) A.F.M.'s Claims Against C.A.M.

56. C.A.M., by virtue of its contractual obligation to report on A.F.M.'s operations, possessed a qualified privilege to make defamatory statements about A.F.M. and to interfere in A.F.M.'s contractual relationship with Westvaco.

57. John Luke hired C.A.M. and its principal, McKinnon, for the express purpose of rendering a professional opinion about A.F.M.'s operations. The bulk of McKinnon's Preliminary Report consists precisely of this—McKinnon's opinions. While A.F.M. management could reasonably differ with some of McKinnon's views concerning what constitutes appropriate operational and training policies for a corporate jet operator, this difference does not make McKinnon's views defamatory.[17]

58. McKinnon's Preliminary Report is not confined to pure expression of opinion. To the extent he ventures into expressly reporting facts or sets forth opinions based on undisclosed facts, McKinnon's report must be scrutinized for defamation. As stated above, the Court finds that some of these statements were false in a material respect and tended to prejudice A.F.M. in the conduct of its business; in other words, the Preliminary Report does contain some defamatory statements.

59. The Court concludes, however, that McKinnon did not exceed his qualified privilege. The Court finds that McKinnon did not make any false statements with the knowledge that they were false or with a reckless disregard for their truth or falsity. The inaccuracies in McKinnon's report is more reasonably attributable to McKinnon's having to respond to Luke's request for an unprecedented preliminary report prior to the conclusion of his audit rather than to any recklessness or knowing deceit. Further, although there might have been some bad feelings between McKinnon and

---

17. For whatever it is worth, the Court generally finds that, given Luke's oft-expressed and nearly single-minded concern for safety, McKinnon's conservative views seem quite reasonable.

A.F.M. at the time the Preliminary Report was written and transmitted to Luke, the Court does not find that this was McKinnon's *primary* motivation. His primary motivation was fulfilling the terms of his agreement with Westvaco to report his findings of safety deficits in A.F.M.'s operations.

60. With respect to the claim that McKinnon intentionally interfered in the A.F.M.-Westvaco contractual relationship, the Court finds that McKinnon was obviously aware of this relationship and knew, or reasonably should have known, that his comments to Luke following the meeting with Frye would cause Luke to terminate A.F.M.'s contract. This action too was subject to the qualified privilege on account of McKinnon's contractual obligation to Westvaco.

61. The question of whether McKinnon exceeded his privilege is much closer and turns on whether, in making his negative statements about A.F.M. to Luke on June 27, McKinnon was acting *primarily* out of spite, ill will, or some motive unrelated to his contractual obligations to Westvaco.

By all accounts, McKinnon's efforts to alter A.F.M.'s operations to satisfy his and Westvaco's concerns were proceeding quite well up until his final meeting with Frye on June 24th. Immediately following this meeting, McKinnon's opinion of A.F.M. and specifically, its willingness to abide by the changes being proposed, had altered dramatically for the worse. To some extent, what precipitated this change was the personal animus which existed between McKinnon and Frye that was first evidenced when McKinnon referred to Frye as a "computer amateur nut," *see supra*, ¶ 14. McKinnon was distressed by the fact that Frye had assumed the role of chief pilot and told him as much.

62. The Court is unwilling to conclude that personal animus was the *primary* motivating factor in McKinnon's actions that caused the termination of the A.F.M.-Westvaco contract. The Court finds that

McKinnon reasonably believed that Frye's appointment as chief pilot in addition to his other duties as Chairman of the Board and director of data processing would impinge negatively on A.F.M.'s operations. McKinnon also had reason to suspect, on the basis of its Rebuttal, A.F.M.'s willingness to implement the changes he was suggesting.

Taking these several factors together, the Court concludes that the personal ill will and hostility he maintained against A.F.M. and Frye, was not what primarily motivated McKinnon. Here too the Court finds that McKinnon's primary motivation was to fulfill his contractual obligation to Westvaco "to conduct an evaluation of the contracted ... operations of Westvaco Corporation as they relate to safety [and] to provide management with an appraisal of the levels of safety at which Westvaco's Flight Operations are performing."

### (2) C.A.M.'s Counterclaims Against A.F.M.

63. As an entity which believed that it had been the victim of defamation, A.F.M. also possessed a qualified privilege to respond to what it believed was C.A.M.'s defamation by defamatory statements of its own.

64. In addition to non-actionable expressions of pure opinion, A.F.M.'s Rebuttal contained false statements of fact. The Court finds these statements defamatory of C.A.M. in that, by implying that its report contained inaccuracies and that the safety audit was incompetently performed, McKinnon was prejudiced in the conduct of its business.

65. The Court concludes, however, that A.F.M. was acting within the scope of its privilege in writing and publishing to Westvaco its Rebuttal. Although A.F.M. undoubtedly bore some ill will towards McKinnon as a result of his Preliminary Report, the Court is unable to conclude that this was its *primary* motivation. The Court finds that A.F.M.'s primary motiva-

tion was its desire to defend itself from what it believed were C.A.M.'s prevarications and to try to salvage its relationship with Westvaco.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION AND CHOICE OF LAW

1. The Court's jurisdiction is based on the diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332.

2. The parties have not disputed that Massachusetts statutory and common law governs the resolution of this case.

### B. APPLICABILITY OF MASS.GEN. LAWS CH. 93A, § 3 EXEMPTION

■ 3. The defendant has pleaded as an affirmative defense the applicability of a statutory exemption from ch. 93A liability. Until 1983, ch. 93A did not apply to

trade or commerce of any person of whose gross revenue at least twenty percent is derived from transactions in interstate commerce, excepting however transactions which (i) occur primarily and substantially within the commonwealth....

Mass.Gen.Laws ch. 93A, § 3(1)(b), (amended, Stat.1983, ch. 242 effective July 7, 1983).

4. In order to be afforded the exemption of § 3(1)(b), the defendant must prove, by a preponderance of the evidence "not only that it derives twenty percent or more of its gross revenue from interstate commerce, but also that the 'transactions and actions' complained of did *not* occur 'primarily and substantially, within the commonwealth.'" *Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 441 N.E.2d 1027, 1030 (1982) (emphasis in original); Mass.Gen.Laws ch. 93A, § 3(2) ("For the purpose of this section the burden of proving exemption from the provisions of this chapter shall be upon the person claiming the exemption."). The defendant has failed

to introduce any evidence as to what portion of its gross revenues was derived from interstate business outside of Massachusetts and the Court is unwilling to engage in speculation on this point.

5. The defendant has also failed to satisfy its burden of proving that the activity in question did not occur primarily and substantially in Massachusetts. While it is true that the defendant drafted the Preliminary Report in Texas and transmitted it to John Luke in New York, the majority of McKinnon's activities relating to the safety audit did occur at A.F.M.'s facilities in Westfield, Massachusetts.

6. The Court, therefore, concludes that C.A.M. has not proved that the relevant activities "did *not* occur 'primarily and substantially within the commonwealth.'" *Burnham*, 441 N.E.2d at 1030. *See Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365, 1372 (D.Mass. 1983), *aff'd* 740 F.2d 59 (1st Cir.1984).

### C. COLLATERAL OR ADVISORY EFFECT OF JURY'S GENERAL VERDICTS

7. Chapter 93A makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce...." Mass.Gen. Laws ch. 93A, § 2(a). In construing the rather broad language of the statute, courts are directed to be guided by the judicial and administrative interpretations given to the federal statute on which § 93A is modeled, section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). Mass.Gen.Laws ch. 93A, § 2(b).

As a general matter, the phrase, "unfair trade practice," may be defined by reference to three factors enunciated by the Federal Trade Commission:

(1) Whether the practice ... is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury

to consumers (or competitors or other businessmen).

29 Fed.Reg. 8325 (1964) *quoted in Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, 92 S.Ct. 898, 905, 31 L.Ed.2d 170 (1972); *Purity Supreme v. Attorney General*, 380 Mass. 762, 407 N.E.2d 297 (1980); *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915 (1975).

8. The plaintiff's ch. 93A claim is premised on the "penumbras" of the common law torts of defamation and intentional interference with contract. The plaintiff contends that the Court should be bound to enter findings consistent with the jury's general verdicts on the common law claims as a matter of collateral estoppel; or, in the alternative, should treat the jury's verdicts as advisory. *See* Fed.R.Civ.P. 39(c).

The Court concludes, however, that it is not constrained by either the concept of collateral estoppel or an advisory's jury's implicit findings.

■ 9. An essential prerequisite to the application of the doctrine of collateral estoppel is the existence of a final judgment. *See Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1982); Restatement (Second) of Judgments § 13 (1982). No final judgment has yet been entered in this case on the common law claims and none has been requested. Federal Rule of Civil Procedure 54(b) makes clear that in the absence of a court's express direction to enter judgment on fewer than all of the claims, a partial adjudication "shall *not* terminate the action as to any of the claims." (Emphasis added).

10. Chapter 93A does not entail a right to a jury trial. *Nei v. Burley*, 388 Mass. 307, 446 N.E.2d 674, 679 (1983). To accept the plaintiff's contention that the Court

ought to be bound by the jury's determination of the common law claims would be, in effect, to give it a right to a jury trial through the back door. More importantly, it would deny the defendant its right to have an independent judicial assessment of ch. 93A claims which are equitable [18] rather than legal in nature. *See Commonwealth v. DeCotis*, 366 Mass. 234, 316 N.E.2d 748 (1974). *Cf. Charles River Construction Co. v. Kirksley*, 20 Mass.App. 333, 480 N.E.2d 315 (1985) (discussion of "right" to a non-jury trial).

11. In *Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365 (D.Mass.1983), the district court discussed the analogous situation of a simultaneous trial of common law jury claims with ch. 93A non-jury claims. In that case (as here) the identical evidence upon which the jury's verdict in favor of the plaintiff's common law claims formed the basis for its ch. 93A claim as well. The Court expressly did not reach the question of whether, once it has already permitted the plaintiff's common law claims to go the jury, it would be permissible for the trial court to make findings inconsistent with the jury findings supported by the identical evidence. 571 F.Supp. at 1373. Nevertheless, the Court based its decision finding ch. 93A liability on two grounds: first, as a completely independent finder of fact, viewing the same evidence entirely independent of the jury's finding; or second, treating the jury's verdict and responses to interrogatories as advisory as provided for in Fed.R.Civ.P. 39(c). *Id.* at 1372–73.

12. Although the jury's verdicts in the instant case are somewhat less amenable to use as advisory because of the absence of special interrogatories, the Court accepts the plaintiff's proposition that at least with respect to the critical issue of primary motive, the jury necessarily had to reach this question and conclude that McKinnon acted

---

**18.** As originally drafted, ch. 93A, § 9(1) granted consumers the right to bring an action "in equity" to redress violations of the statute. However, with the merger of law and equity engendered by the adoption of the Massachusetts Rules of Civil Procedure, the legislature struck the words "in equity" from ch. 93A in 1978. St.1978, ch. 478, § 45. *Nei,* 446 N.E.2d at 677.

primarily out of malice in defaming A.F.M. and intentionally interfering with the A.F.M.-Westvaco contractual relationship.[19]

■ 13. Nevertheless, it would seem that if either or both of the parties wished to give the jury's verdict advisory effect, they should have requested this at the outset of the trial. It strikes the Court as unfair and inequitable to permit a party to wait and see what the jury's verdict will be before making application to the Court to employ a rule 39(c) advisory jury. In addition, although Rule 39(c) permits a court to submit issues to an advisory jury "on its own initiative," the Court thinks it the better practice for the parties to have received notice of this decision in advance. *See Ford v. C.E. Wilsin & Co.*, 30 F.Supp. 163, 166 (D.Conn.1939); 5 C. Moore, Federal Practice ¶ 39.10[1] (2d ed. 1985). As such advance notice was not given, the Court will not give the jury's determination any advisory effect. Thus, the Court holds that it must make independent findings of fact even though they may conflict with the jury's determinations.[20]

### D. A.F.M.'S CH. 93A CLAIM AGAINST C.A.M.

14. The wrongful conduct of which C.A.M. is accused, namely defamation and interference with contract, are actionable under Mass.Gen.Laws ch. 93A because they clearly are "within at least the penumbra of some common law, statutory, or other established concept of fairness." 29 Fed.Reg. 8325 (1964); *Purity Supreme*, 407 N.E.2d at 307. These allegations, if proven, entail "immoral, unethical, oppressive or unscrupulous" conduct which may cause "substantial injury to ... other businessmen." *Id.*

15. The court concludes that A.F.M. was defamed by some of the statements contained in C.A.M.'s Preliminary Report because these statements were false in some material respect, *see* Restatement (Second) of Torts, § 581A, (1977), and prejudiced A.F.M. in the conduct of its business and deterred others (notably Westvaco) from dealing with it. *See Finnish Temperance Society Sovittaja v. Publishing Co.*, 106 N.E. 561 (Mass.1921); Restatement (Second) of Torts § 561(a).

16. C.A.M. made statements to Westvaco which McKinnon knew, or reasonably should have known, would cause Westvaco to terminate its contractual relationship with A.F.M. *See Commonwealth v. Zolotas*, 356 Mass. 594, 254 N.E.2d 789 (1970).

■ 17. The Court finds that C.A.M. possessed a conditional or qualified privilege to make defamatory statements about A.F.M. and to interfere with its contractual relationship with Westvaco due to C.A.M.'s contractual obligation Westvaco to furnish it with information about A.F.M.'s operations. *See Bratt v. International Business Machine Corp.*, 392 Mass. 508, 467 N.E.2d 126, 131 (1984) ("Massachusetts courts have recognized that a person may possess a conditional privilege to publish defamatory material necessary to the protection or furtherance of a legitimate business interest."); *Gram v. Liberty Mutual Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 24

---

**19.** This is so because the Court charged the jury that C.A.M. was entitled to qualified privilege as a matter of law and could not be held liable on either claim unless the jury found that McKinnon acted primarily out of malice, as that term was defined.

**20.** The fact that the Court's findings of fact are inconsistent with the jury's general verdicts should not be taken as intimating that a judgment notwithstanding the verdict is appropriate. It is quite possible for two different finders of fact to view the identical evidence and emerge with totally conflicting results, both of which are supportable by the evidence. The standard for granting a judgment notwithstanding the verdict, Fed.R.Civ.P. 50(b), is that "without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict the court should determine the proceeding by ... judgment notwithstanding the verdict." *Brady v. Southern Railroad*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943). Clearly, it is often possible for there to be two reasonable conclusions as to an appropriate verdict.

(1981) (conditional privilege to interfere with contractual relations).

18. C.A.M. did not exceed this qualified privilege because the Court finds that it did not act (1) with the knowledge that its statements were false or with a reckless disregard for their truth or falsity, *see Bratt*, 467 N.E.2d at 131; *Tosti v. Ayik*, 386 Mass. 721, 437 N.E.2d 1062 (1982); or (2) *primarily* out of spite, ill will, or some motive unrelated to its contractual obligations to Westvaco. *See Ezekiel v. Jones Motor Co.*, 374 Mass. 382, 372 N.E.2d 1281, 1287 (1978); *Boston Mutual Life Insurance Co. v. Varone*, 303 F.2d 155, 159 (1st Cir.1962).

19. As C.A.M. did not exceed its qualified privilege, the Court concludes that it did not engage in any unfair or deceptive trade practices with respect to A.F.M.

## E. C.A.M.'S COUNTERCLAIM AGAINST A.F.M. FOR CH. 93A VIOLATION

20. The Court finds that A.F.M.'s Rebuttal contained false and misleading statements which defamed C.A.M. by implying that C.A.M.'s Preliminary Report was false and that the safety audit was incompetently performed.

21. A.F.M. enjoyed a conditional privilege, however, to make defamatory statements because it was defending itself from what it reasonably believed were defamatory statements of C.A.M.'s. *See Galvin v. New York, N.H. & H.R.*, 341 Mass. 293, 168 N.E.2d 262 (1960).

22. A.F.M. did not exceed its conditional privilege because it did not act (1) with the knowledge that its statements were false; (2) with a reckless disregard for their truth or falsity; or (3) *primarily* out of spite, ill will, or some motive unrelated to its legitimate right to defend itself.

23. Accordingly, as A.F.M. did not exceed its conditional privilege, it did not engage in any unfair or deceptive business practice.

## III. CONCLUSIONS

The Court finds that C.A.M. did not engage in any unfair or deceptive trade practices. Therefore, the Court finds for the defendant and against the plaintiff on the plaintiff's ch. 93A claim.

The Court also finds that A.F.M. did not engage in any unfair or deceptive trade practices. Therefore, the Court finds for the plaintiff and against the defendant on the defendant's ch. 93A counterclaim.

An appropriate Order directing the Clerk to enter judgment consistent with this opinion shall issue.

## ORDER

For the reasons set forth in an Opinion issued this date, the Clerk is instructed to enter judgment in the above-captioned case as follows:

(1) For the plaintiff and against the defendant on the plaintiff's count of defamation and award damages in the amount of $1.00, in accordance with the jury's general verdict.

(2) For the plaintiff and against the defendant on the plaintiff's count of intentional interference with contractual relationship and award damages in the amount of $446,012.00, in accordance with the jury's general verdict.

(3) For the plaintiff and against the defendant on the defendant's counterclaim for defamation, in accordance with the jury's general verdict.

(4) For the defendant and against the plaintiff on the plaintiff's count for violation of Mass.Gen.Laws ch. 93A, § 11, in accordance with the Court's Opinion.

(5) For the plaintiff and against the defendant on the defendant's counterclaim for violation of Mass.Gen.Laws

ch. 93A, § 11, in accordance with the Court's Opinion.

The Clerk is directed to compute interest as appropriate.

Each party is to bear its own costs and fees.

It is So Ordered.