PHILIP NEI & another [1] vs. JUSTIN W. BURLEY
& others. [2]

Essex. September 16, 1982. — March 4, 1983.

Present: WILKINS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Fraud. Practice, Civil,* Jury trial, Consumer protection case. *Consumer Protection Act,* Availability of remedy, Unfair act or practice. *Real Property,* Sale. *Broker,* Deceit.

In an action by the buyers of a house lot against the sellers and a real estate broker employed by the sellers, there was no error in directing verdicts for the defendants on the count of the complaint seeking damages on the basis of fraudulent misrepresentations that the land was suitable for a house and that it passed certain percolation and high water tests conducted on the sellers' behalf where the defendants, who had furnished the buyers with the nonconclusory results of the tests, owed no duty to the buyers to disclose their knowledge of the existence of a seasonal stream of water on the land and where, in view of the fact that the buyers, after learning of an excessive accumulation of water before they executed the purchase and sale agreement, had the opportunity but failed to ask the land surveyor to interpret the test results, there was no reliance on any representation of the defendants as to the suitability of the land. [310-311]

In an action by the buyers of a house lot against the sellers and a real estate broker employed by the sellers, the plaintiffs had no right to a trial by jury on the count of their complaint alleging a violation of G. L. c. 93A, § 2, the Consumer Protection Act. [311-315]

In an action by the buyers of a house lot alleging that a real estate broker employed by the sellers failed to inform them that a previous prospective buyer was relieved of his agreement to purchase the lot because of excessive surface water on the lot, evidence warranted a finding that the broker had not violated a regulation of the Attorney General making it a violation of G. L. c. 93A, § 2(c), for one to fail to disclose to a buyer a fact which may have influenced the buyer not to enter the transaction, where there was no affirmative misrepresentation by the

---

[1] Eleanor Nei, the other plaintiff, is the wife of Philip Nei.

[2] The other defendants are Beatrice Burley, Justin's wife, and Milldam Associates, Inc., a real estate brokerage office.

broker and no showing that the broker knew or should have known about the problems of wetness. [315-317]

In an action under G. L. c. 93A, § 2, the defendants who, as private individuals, sold the plaintiffs a house lot were not shown to be engaged in trade or business within the meaning of § 2 where it appeared that the lot had been part of a tract of land conveyed to the defendants by a member of their family with the understanding that no lots should be sold until their children reached college age and then only to help pay the costs of college, where the sellers played a minor role in the sale of the lots, reserving to themselves only the acceptance or rejection of offers to purchase, and where the sellers did not devote any appreciable part of their time to real estate matters. [317-318] ABRAMS, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on May 25, 1979.

The case was tried before *Dolan, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*James A. Frieden* for the plaintiffs.

*Brian T. Callahan* for Justin W. Burley & another.

*Robert S. Kutner* for Milldam Associates, Inc.

*Philip S. Lapatin,* for Massachusetts Association of Realtors, amicus curiae, submitted a brief.

NOLAN, J.   The plaintiffs (buyers) purchased a house lot in Carlisle from the defendants Justin and Beatrice Burley (sellers) who had engaged the defendant Milldam Associates, Inc. (broker), to market the lot.   In their complaint, the buyers allege that the sellers and the broker represented to them that the land was suitable for a house and that it passed percolation and high water tests which were taken in August, 1978; that both the sellers and broker knew but did not disclose that earlier tests taken in the spring of 1978 revealed a lot unsuitable for house building and that a catch basin or storm drain of the town of Carlisle spilled water onto the land when it rained.   The complaint also alleges that a prospective purchaser had earlier terminated an agreement to buy because of wetness in the springtime, but that this fact was not disclosed to the buyers and, finally, that the

presence of a high water table forced the buyers to truck considerable amounts of fill to the lot to raise its level so that the septic system would meet the requirements of the applicable sanitary code. The complaint avers that the increase in construction costs represents the buyers' damages.

The buyers' complaint seeks recovery against all defendants on three bases: (1) breach of warranty; (2) fraud; and (3) violation of G. L. c. 93A, § 2, the Consumer Protection Act. To complete the pleadings' picture, the defendants filed an answer and a counterclaim charging defamation. To the dismissal of the counterclaim no appeal has been taken. The defendants also filed a third-party complaint against Edmund H. Campbell, Inc. (Campbell), a real estate brokerage company which represented the buyers and against the town of Carlisle which had issued a permit or license for the septic system. Prior to trial the third-party complaint against Carlisle was dismissed and no appeal was claimed. During trial, a motion for directed verdict in favor of Campbell was allowed. No appeal has been taken from that action.

The counts for breach of warranty and fraud were tried to a jury. The judge allowed motions for directed verdicts at the close of the plaintiffs' case on these counts.

The buyers' count for violation of G. L. c. 93A, § 2, was tried by the judge without jury. However, to assist the judge in her determination of the questions of fact, two special questions were submitted to the jury: 1. Whether the buyers received information orally from a registered land surveyor employed by the sellers that a seasonal stream ran through a pipe or culvert onto the property; and 2. Whether written information prepared by the surveyor consisting of the results of percolation tests, deep hole tests, and the existence of a water table was given to the buyers prior to their meeting with the surveyor at the locus. The jury answered, "No," to the first question and, "Yes," to the second. Judgment was entered on findings for the defendants. We allowed the buyers' application for direct appellate review.

.

The appeal raises four issues: (1) the sufficiency of the evidence of fraud; (2) the denial of a jury trial for the count under G. L. c. 93A, § 2; (3) the sufficiency of evidence as to the broker's violation of G. L. c. 93A, § 2; and (4) the determination that the sellers were not engaged in trade or commerce as that phrase is used in G. L. c. 93A, § 2 (a).[3] We shall treat these issues de suite. We discern no error and we affirm the judgments.

1. *Fraud.* We examine the evidence and all reasonable inferences which may be drawn from the evidence in the light most favorable to the plaintiffs when evaluating the allowance of a motion for directed verdict. *Kelly* v. *Railway Express Agency, Inc.*, 315 Mass. 301, 302 (1943). The broker for the sellers furnished the buyers with the results of the percolation and other tests conducted by the land surveyor and engineer employed by the sellers. These results contained no interpretive data or conclusions. The seller and the broker knew of the seasonal stream but they did not reveal this information to the buyers. Under the circumstances, there was no duty to make such revelation. This failure is mere nondisclosure and fails to reach the watermark of fraud. See *Brockton Olympia Realty Co.* v. *Lee,* 266 Mass. 550, 561 (1929). The sellers and broker did not convey half truths nor did they make partial disclosure of the kind which so often requires a full acknowledgment to avoid deception. See and contrast *Kannavos* v. *Annino,* 356 Mass. 42, 48-49 (1969); *Kidney* v. *Stoddard,* 7 Met. 252, 254-255 (1843). Accordingly, the provisions of Restatement (Second) of Torts § 551 (2) (b) (1977) are not apposite because they refer to partial and ambiguous statements.

Sellers and brokers who represent sellers are not liable in fraud for failing to disclose every latent defect known to them which reduces materially the value of the property and of which the buyer is ignorant. Cf. *Kannavos* v. *Anni-*

---

[3] We leave untreated a fifth issue concerning the adequacy of the demand letter from the buyers to the broker because we conclude that the broker did not violate G. L. c. 93A, § 2.

*no, supra* at 48. Contrast, *McDonough* v. *Whalen,* 365 Mass. 506, 511-512 (1974), in which the court, for the first time, recognized the liability of a building contractor to persons who are not in contractual relation with him for a negligently completed building. There existed no fiduciary duty between the sellers and buyers and none between the broker and buyers. They dealt at arm's length with each other and there was no peculiar duty to speak. There were no material misrepresentations on which the buyers relied. See *Nei* v. *Boston Survey Consultants, Inc., post* 320 (1983).

The buyers make much capital out of the description of the land in the Multiple Listing Service (MLS) book to the effect that the lot was a "nice, wooded building site. Tested, surveyed and approved by the Planning Board . . . ready to go!" The obstacle in the path of the buyers' recovery based on these descriptive phrases is the knowledge which they had of excessive water on the lot before they executed the purchase and sale agreement. Mrs. Nei (a buyer) testified that she had seen the report of the tests conducted on the lot and that she met Corbin, the registered land surveyor who performed the tests, on the lot before she or her husband had signed the purchase and sale agreement. Corbin told her of the existence of excessive water. She had the opportunity of asking Corbin to interpret the significance of his report but she did not ask him. All of these admissions by Mrs. Nei tend to demonstrate that the buyers did not rely on any representation of the defendants or on the defendants' silence. Reliance is an element of actionable fraud. *Kilroy* v. *Barron,* 326 Mass. 464, 465 (1950). Restatement (Second) of Torts § 537 (1977).

For these reasons, there was no error in directing verdicts for the defendants on the count charging fraud. The buyers have advanced no argument on the propriety of the directed verdict as to breach of warranty and, therefore, we do not reach it. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

2. *Trial by jury under G. L. c. 93A.* As originally written, G. L. c. 93A, § 9 (1), provided that an aggrieved con-

sumer might bring "an action . . . in equity for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper." St. 1969, c. 690. In 1978, the Legislature struck the words "in equity" in response to the procedural merger of law and equity engendered by the adoption of the Massachusetts Rules of Civil Procedure. G. L. c. 93A, § 9 (1), as amended through St. 1978, c. 478, § 45. The plaintiffs argue that we should descry from the elimination of these words a legislative intent to confer a trial by jury. This argument is less than compelling because the Legislature left undisturbed multiple references to the "court" in § 9. See, e.g., § 9 (2), (3), (4). In these sections the language is "if the court finds . . . ." When first enacted, the word "court" obviously referred to a judge and not a jury.

It is beyond doubt that the Legislature may grant a right to a trial by jury to one who is aggrieved by a violation of a statute. See, e.g., G. L. c. 224, § 19, as amended by St. 1974, c. 414, § 5. Cf. *Stockbridge* v. *Mixer,* 215 Mass. 415, 418 (1913). That there was no such right in 1780 when the Massachusetts Constitution was adopted is not entirely responsive because the power to grant a jury trial reposes in the Legislature which can confer a right to a jury trial in connection with a newly recognized cause of action. See *Parker* v. *Simpson,* 180 Mass. 334, 344-346 (1902).

It may be argued that, if the claim is for a deceptive act or practice, a right to a jury trial should be recognized whereas if the averment raises only a claim of unfairness no such right exists. See Montgomery & Wald, The Right To Trial By Jury in c. 93A Actions, 67 Mass.L.Rev. 79 (1982), in which the authors contend for a dichotomy between the issue of deception on which they assert a right to a jury trial and the issue of unfairness on which there is probably no such right.

In *Commonwealth* v. *DeCotis,* 366 Mass. 234, 244 n.8 (1974), the primordial case under c. 93A, the court quoted with approval the statement in the Attorney General's brief "that the statutory words '[u]nfair and deceptive practices'

[in G. L. c. 93A, § 2,] are not limited by traditional tort and contract law requirements." The terms "[u]nfair methods of competition" and "unfair or deceptive acts or practices" are not defined by c. 93A. However, courts are directed by § 2(*b*) to be guided in their construction of these terms by interpretations given by the Federal Trade Commission (FTC) and the Federal courts to relevant provisions of the Federal Trade Commission Act (Federal act). In addition, "the Attorney General is empowered to make interpretive rules and regulations consistent with the FTC's and the Federal courts' construction of the Federal act." *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 694-695 (1975). This flexible set of guidelines as to what should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms "unfair and deceptive" to grow and change with the times. Thus, although certain consumer violations are perhaps rooted in common law claims, the Legislature left the terms sufficiently open-ended to embrace causes of action for which there are no common law analogues. In such cases, the line separating what is "deceptive" from what is "unfair" is thin indeed, and a claim for "deceptive practices" might entail the same kinds of determinations which are inherent in claims of "unfair practices" and which are the traditional province of the court.

It can also be argued that any analogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims. A plaintiff in a c. 93A case, for example, need not prove the existence of a contract, the defendant's intent to misrepresent, or his own reliance on the misrepresentation, all traditionally issues of fact for the jury. In *Stockbridge* v. *Mixer*, 215 Mass. 415 (1913), this court determined that the defendants were entitled to a jury trial in a reach and apply action as to those issues "respecting the debt alleged to be due from them to the plaintiff" but not as to issues related to the equitable

remedy of collecting the debt. *Id.* at 418. The statute under which the cause of action arose combined the establisment of the debt, an action traditionally at law, with the process of collecting the debt, traditionally a matter of chancery. The court stated that "[w]here the right to trial by jury has the protection of the Constitution because connected with an action at common law, a party cannot be deprived of that right because a change in the form of procedure has made it cognizable in courts of equity." *Id.* The difference between that case and claims under c. 93A, however, is that in the action tried to the jury in *Stockbridge* — the establishment of the debt — all the traditional common law elements had to be proved. Consequently, although claims under c. 93A can be said to be historically "connected with an action at common law," *Stockbridge* is not authority for the proposition that claims merely historically or analogously connected to actions at common law require a jury trial. The court should therefore be hesitant to imply a right to a jury trial for the sui generis causes of action for unfair or deceptive practices in the absence of legislative direction.

However, art. 12 of the Massachusetts Declaration of Rights guarantees that "no subject shall be . . . deprived of his property, . . . but by the judgment of his peers, or the law of the land." The Legislature cannot eliminate a right to trial by jury which is founded on a constitutional guarantee. See *Commonwealth* v. *One 1972 Chevrolet Van,* 385 Mass. 198, 203 (1982).

The elimination of the words "in equity" does not conclusively or even persuasively remove the equitable nature of consumer actions. Relief tailored for the consumer is a thread which is weaved throughout the entire consumer law fabric. This court said in *Commonwealth* v. *DeCotis,* 366 Mass. 234, 245 (1974): "We believe that, as originally enacted, G. L. c. 93A granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of and to make the decree effective." Further, the consumer protection statute, G. L.

c. 93A, has created new substantive rights in which conduct heretofore lawful under common and statutory law is now unlawful. See *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975).

In all, the equitable nature of the relief permitted and the silence of the Legislature leads us to conclude that there is no right to a trial by jury for actions cognizable under G. L. c. 93A. If this conclusion does not reflect the mind of the Legislature, it is free to change the law and to grant a right to a trial by jury.

3. *Evidence of broker's violation of G. L. c. 93A.* The trial judge heard the case without jury and made findings of fact and conclusions of law (see Mass. R. Civ. P. 52, 365 Mass. 816 [1974]), on that part of the plaintiffs' case founded on violations of G. L. c. 93A, § 2. There was evidence that the broker listed the property under the MLS on behalf of the sellers. The broker never spoke with the buyers. The buyers were shown a copy of the MLS sheet which was issued from the broker's office. It is undisputed that in October, 1978, prior to the execution of the purchase and sale agreement, Boston Survey Consultants, Inc., sent the broker "the results of [a] soils investigation" concerning the lot. That report indicated that as to test pits on the lot there had been "surface water at 24" on April 18, 1978. The report was given to the buyers without any explanation or interpretation by the broker or by Boston Survey Consultants, Inc. It also appears that the health regulations of the board of health of Carlisle required that the bottom of leaching facilities "must be 4' above maximum groundwater elevation," the height of groundwater at its maximum elevation. The plaintiffs make no claim, however, that the broker knew of the significance of the test results in relation to the board of health requirements. Certainly, the test results, considered in relation to the requirements of the board of health, raised a question whether the lot was capable of sustaining a proper septic system without the introduction of considerable amounts of fill. The plaintiffs do not argue that, even if the broker did not know the signifi-

cance of the test results, the broker should reasonably have known and should have disclosed the significance of those results. Nor was there any evidence that directly indicated that a reasonable broker should have known of the signifi- cance of the test results. If a person is in the trade or business of acting as a broker for the sale of residential house lots, has described a lot as "[t]ested" and "ready to go," and has furnished a potential buyer accurate soil tests which demonstrate a significant problem to an informed person but not to a layman, a serious question would arise as to whether the broker's conduct was an unfair or deceptive act, at least where the broker knew or should have known of the significance of the test results. But the plaintiffs made no such argument, and we offer no dispositive opinion on the point.

The plaintiffs do rely on the failure of the broker to in- form them that a previous prospective purchaser was re- lieved of his agreement to purchase the lot because of water problems. A percolation test could not be conducted in March, 1978, because there was too much surface water. The prospective buyer was allowed to withdraw. It was stipulated that the lot never failed a percolation test. We see no unfair or deceptive act in failing to mention the in- ability to conduct a percolation test because of excess sur- face water. This failure to disclose is particularly innocuous because it was agreed that the broker never knew of the culvert under the road that presumably increased the amount of surface water on the lot.

The judge concluded that the broker had not violated the regulation of the Attorney General which makes it a viola- tion of G. L. c. 93A, § 2 (c), for one to fail to disclose to a buyer or prospective buyer a fact which may have influ- enced the buyer or prospective buyer not to enter the trans- action. 940 Code Mass. Regs. § 3.16 (2) (1978). This con- clusion is sound. The judge found (and there is support in the evidence) that the broker had no knowledge that the lot would require additional fill to permit construction of the house and septic tank. In this vital respect, the instant case

is distinguishable from *Mongeau* v. *Boutelle,* 10 Mass. App. Ct. 246 (1980), in which the defendant broker misrepresented the size of the lot to the buyer, and failed to disclose that the property was encumbered by a right of way though he knew or should have known about it. In the instant case there is no affirmative misrepresentation and no showing that the broker knew or should have known about the problems of wetness, especially in the light of the fact that the test results were all accurate.

4. *Whether the sellers are engaged in trade or commerce within G. L. c. 93A, §§ 2 & 9.* In *Lantner* v. *Carson,* 374 Mass. 606 (1978), the court had no difficulty in concluding that the defendants who sold their home, as individuals, were not engaged in trade or commerce with all the implications which flow from such engagement under G. L. c. 93A, § 2. Our case is somewhat different. In *Begelfer* v. *Najarian,* 381 Mass. 177, 190-191 (1980), certain standards were delineated to gauge whether parties to a transaction are engaged in trade or commerce and, accordingly, are subject to G. L. c. 93A, § 2. The transaction must take place in a "business context," *Lantner* v. *Carson, supra* at 611, and to determine the presence of a "business context" we should consider such relevant factors as the nature of the transaction, the character of the parties involved, the activities in which the parties participated, and whether the transaction is motivated by business or personal reasons. *Begelfer* v. *Najarian, supra* at 190. In evaluating the instant transaction and in applying these criteria, we conclude that the sellers in this transaction were not engaged in trade or business in such wise as to subject them to liability under G. L. c. 93A, § 2, though they come manifestly closer to the "trade or business" line than the defendants in *Lantner.*

The subject lot is part of a tract of land consisting of fourteen acres conveyed to the sellers by a family member in 1965 with the understanding that no lots should be sold until the children of the sellers reached college age and then only to help pay the costs of college. The sellers played a

minor role in the sale of the lots, reserving to themselves on-
ly the acceptance or rejection of offers to purchase. Justin
Burley, one of the sellers, was employed as a full-time fluid
power engineer and Beatrice Burley, the other seller, was a
housewife. Neither seller devoted any appreciable part of
his or her time to the real estate.

   The basic policy of G.L. c. 93A "to ensure an equitable
relationship between consumers and persons engaged in
business" *(Heller* v. *Silverbranch Constr. Corp.,* 376 Mass.
621, 624 [1978]), does not require us to reverse the trial
judge's conclusion that the sellers were not engaged in trade
or business, though the question is a close one on these facts.

*Judgments affirmed.*

   ABRAMS, J. (dissenting in part). I dissent. The court has
turned *Begelfer* v. *Najarian,* 381 Mass. 177 (1980), upside
down to reach the result that the Burleys are not liable
under G.L. c. 93A. Whether an individual's participation
in a transaction takes place "in a 'business context' must be
determined [by the] . . . nature of the transaction, the
character of the parties involved, and the activities engaged
in . . . , whether [a] similar transaction ha[s] been under-
taken in the past, whether the transaction is motivated by
business or personal reasons . . ., and whether the partici-
pant played an active part in the transaction." *Begelfer* v.
*Najarian,* 381 Mass. at 190-191.

   The defendants in *Begelfer* v. *Najarian* did not act in a
business context. They were passive investors, who could
not negotiate the terms of the loan, did not actively manage
the loan, and received loan payments from an agent. The
court determined that the Burleys likewise were not active
in the sale of their land. However, the Burleys actively
engaged in conduct designed to enhance their profit from
selling their land. They had the land surveyed and divided
into lots by experts.[1] They hired a broker to advertise and

---

[1]It is unclear whether the Burleys were required to file a subdivision
plan.

sell the land. Further, the Burleys may negotiate the terms of a sale, may increase or reduce the price of the land, and retain the right to accept or reject any bid. To this extent, the Burleys are no different from an average developer who holds unimproved land. The Burleys, in fact, are the moving force in the business. They can supervise and direct the business, and they have not delegated their authority over the property to anyone else. I fail to see how their active control, direction, management, and supervision of the property and its sales can be viewed as a minor, passive role. By their conduct, the Burleys are engaged in "trade" or "commerce," within the meaning of G.L. c. 93A, § 2.

Unlike *Lantner* v. *Carson*, 374 Mass. 606, 612 (1978), the Burleys are not on an equal footing with the Neis. The experts they hired to assist them provided them with the benefit of expert knowledge, equivalent to that of any professional selling real estate.

The Burleys are entitled to enhance their profits to pay for their children's education, by treating their land as if they were developers. Having elected to treat their land as a business venture, the Burleys, therefore, were engaged in trade or commerce. In these circumstances, the Burleys should not be permitted to educate their children at the expense of consumers. In my view, the facts require a conclusion that the Burleys are within the ambit of G.L. c. 93A, § 2. I respectfully dissent from that portion of the court's decision.

I agree with the court's conclusion that the broker is not liable to the Neis under G.L. c. 93A. The broker's conduct in describing land as "ready to go," when in fact it was not ready to go, was unfair and deceptive. However, the plaintiffs did not allege or prove "a causal connection between the deception and the loss." *International Fidelity Ins. Co.* v. *Wilson*, 387 Mass. 841, 850 (1983). Failure to prove such a causal relationship is fatal to the Neis' G.L. c. 93A claim against the broker.