Raymond S. OLIN, Plaintiff, Appellant,

v.

The **PRUDENTIAL INSURANCE COMPANY OF AMERICA,**
Defendant, Appellee.

Raymond S. OLIN, Plaintiff, Appellee,

v.

The **PRUDENTIAL INSURANCE COMPANY OF AMERICA,**
Defendant, Appellant.

Nos. 85–1871, 85–1872.

United States Court of Appeals,
First Circuit.

Argued April 8, 1986.
Decided July 29, 1986.

David G. Hanrahan, with whom James W. Murphy and Gilman, McLaughlin & Hanrahan, Boston, Mass., were on brief, for Raymond S. Olin.

Peter B. Ellis, with whom Kevin J. Fitzgerald and Foley, Hoag & Eliot, Boston, Mass., were on brief, for The Prudential Ins. Co. of America.

Before BOWNES, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

In March 1981 the defendant, Prudential Insurance Company, discharged the plaintiff, Raymond Olin, a Prudential executive. Olin sued Prudential, claiming "breach of contract" and unlawful 'sex discrimination.' Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a); Massachusetts Fair Employment Act, Mass.Gen.Laws Ann. ch. 151B. The district court submitted Olin's "breach of contract" claims to a jury in the form of nine special questions embodying three separate contract theories. The jury found in Olin's favor on all three theories. The court set aside the jury's verdict on two of the three theories (granting defendant a judgment n.o.v.); and, in effect, it reduced the damages the jury awarded plaintiff in respect to the third. The court, sitting without a jury, found in defendant's favor on the 'sex discrimination' claims.

These appeals attack the validity of the district court's decision. The parties raise factually based issues that (with one exception) do not involve any significant general question of law. The plaintiff (Olin) argues that the district court should not have directed verdicts against him on two of his contract theories because the record contains enough evidence to support the jury's findings; the defendant (Prudential) says the record does not contain enough evidence to support the jury findings on the third contract theory so the court should have directed a verdict against Olin on that theory as well. Olin also says the evidence supports him on sex discrimination; and (raising one purely legal question) he adds that he was entitled to a jury trial on these latter claims.

As in many record-based appeals of this kind, we have read the briefs and examined with care those portions of the record that the parties have cited. On the basis of this examination, we conclude that the district court's decisions are legally correct. Because the appeal lacks general legal significance, we see no reason to set out the facts in detail; they are already well known to the parties. Rather, we shall simply indicate here, for the parties' benefit, our basic reasons for rejecting their efforts to overturn the district court's judgment.

I

Olin's Breach of Contract Claims

We begin with the contract claims. For purposes of considering these claims, we can assume the following very rough outline of key facts. Olin was head of Prudential's Northeast Home Office. Olin's superior, Robert Scales, thought that Olin was doing a poor job and apparently was also concerned about Olin's personal life. Olin's wife was going to divorce him, and Olin intended to marry an office employee, Sandy Tyzbir, with whom (Scales had been

told) Olin had been carrying on a somewhat open love affair. On January 7, 1981, Scales met with Olin, and, according to Olin, their conversation went as follows:

*Olin.* Mr. Scales said to me that he had talked with Skip Pease [Newark] and that they felt for the better of the Prudential that I be transferred as an agency manager somewhere; that it would be better because of maybe a messy divorce; that I'd be happier.

Then he said to me, "We'll find you a [great] agency, Ray, one that pays lots of money, one that you'll be very happy with, one of your choice, and Sandy Tyzbir can join you, if we can find one at a regional home office."

Q. And what did you say to Mr. Scales at that time?

A. As a loyal Prudential person, I said, "If it is for the better for the Prudential and that is how you feel, and as long as I get a good agency, I'll agree to this."

Subsequently, Scales and Clarence (Skip) Pease (the Senior Vice President, Ordinary Agency Department) arranged an opportunity for Olin to take charge of the Houston agency, at a salary that would fluctuate with sales, but which was guaranteed at $81,400 (Olin's current salary) for at least the first year. On March 16, Scales told Olin he had one day to make up his mind about Houston. A day later Olin turned down the offer, and Scales told Olin he was fired. Thirteen weeks after that Olin found another job with Metropolitan Life Insurance Company ("Metropolitan") at a salary of $75,000. .

Olin claims that his dismissal violated both an oral contract embodied in the January 7 conversation and Prudential's termination policy, which (he said) formed part of the terms of his employment. The submitted questions and the jury's answers about these matters are as follows:

1. Did Mr. Scales or Mr. Pease contractually promise plaintiff that he would be given a managerial job that paid as well as his job as vice president?

   Yes ___ X ___   No ___

2. If you answer question No. 1 Yes, what, if any, were plaintiff's damages over and beyond, that is to say, after giving credit for, what he received from Metropolitan?

   $90,000.00

3. Quite apart from the so-called company policy, to be considered later, did Mr. Scales contractually promise plaintiff that he could stay on as Northeast agency vice president, for a reasonable length of time, in order to be able to choose an agency managership appearing elsewhere, if, in a reasonable time, one did?

   Yes ___ X ___   No ___

4. If your answer to question 3 is Yes, do you find plaintiff would have obtained a better agency than Houston in a reasonable length of time?

   Yes ___ X ___   No ___

5. If your answer to question No. 4 is Yes, what were plaintiff's damages, that is to say, how much, if any, better off would he have been than he was with Metropolitan Life Ins. Co.?

   $200,000.00

6. Did the plaintiff have a termination policy that was applicable to plaintiff?

   Yes ___ X ___   No ___

7. If your answer to question No. 6 is Yes, was it a general guideline, or a contractual obligation?

   (a) Guideline _____

   (b) Obligation ___ X ___ .

8. If your answer to question No. 7 is (b), did defendant fail to substantially perform?

   Yes ___ X ___

   No _____

9. If you answer question No. 8 Yes, what, if any, were plaintiff's damages over and beyond, that is to say, after giving credit for, what he received from Metropolitan?

   $50,000.00

The district court entered judgment n.o.v. in defendant's favor (i.e., substituted answers of 'no') on questions 1, 4, and 6. It also set aside the jury's answer of $200,-000 to question 5. Instead it found damages (under question 3) in the amount of $21,604.43. *See* Fed.R.Civ.P. 49(a) (allowing the court to decide questions not submitted to the jury). We consider the par-

ties' objections to these court actions in turn.

## Question 1

■ Olin says the district court should have allowed the jury's answer to question 1 to stand. Olin argues:

[T]he jury was manifestly warranted in concluding that Prudential contractually promised Olin that he would be given a managerial job that paid as well as his [current] job as Vice President, Ordinary Agencies, that he would be given a choice of available agencies as they came up and would remain as VPOA until that choice was made (A. 264–265, 274, 437, 1047, 1048).

The problem with this argument (and with the answer to question 1) is that, if one takes literally the words "would be given" (and Olin means them literally), they lack record support. Olin wanted an agency outside New England. But, as the district court noted, neither Scales nor Pease could tell other area presidents what to do, and Olin knew it. At most, they could promise to *try to find* Olin an agency elsewhere and to keep him on in the interim. Nor, given the context and Olin's status as an "at will" employee, could a reasonable juror believe that Scales meant this interim to last beyond a "reasonable time."

There is only one contract theory that has record support, namely, that Scales promised to use his best efforts to find Olin a good agency, and that Scales also promised to keep him on for a reasonable time while he did so. Questions 3 through 5 come closest to embodying that theory. That is what the district court thought, and we believe it was right.

The following record references to which Olin points do not provide Olin with adequate support in respect to question 1.

a) Appendix at 264–265. These pages contain Olin's testimony reproduced above.

b) Appendix at 274. This page contains the following testimony referring to a conversation in February 1981—about a month later.

Olin: I said to [Scales], 'Say there is no problem with our staying here as Vice President of Ordinary Agencies, is there?' He said, 'Oh, no, Ray, until you get your agency, don't worry about it.'

Olin does not claim that this February conversation constituted a part of the January "contract." And, read in context as evidence about what was said earlier, it does not show that the January promise was a promise to keep Olin on indefinitely, beyond a "reasonable time."

c) The remaining testimony about January's conversation to which Olin points must be read as qualified by the words "for a *reasonable* time." Given the controversies and problems surrounding Olin's tenure, no reasonable person could interpret Scales' words as offering to keep Olin in his present job indefinitely.

e) Appendix at 1047–1048. These pages refer to two memoranda, one of which was circulated to personnel in the Northeast and the other of which went to executives in other areas, telling them that Olin was looking for an agency manager's job. The first contains the sentence, "Until Ray's choice is made, he will remain as Vice President." The second says, "Ray will continue to work in his current position until an appropriate location and effective date for his reassignment can be established."

Olin concedes that these latter two memos do not embody the oral contract. Rather, they were written in an effort to find him another job, to "sell" him as an agency manager. If these memos were to succeed, they could not indicate that Olin's tenure in his present job was precarious. Thus, they offer *no evidence of a promise of retention* beyond a "reasonable time"; nor do they suggest that Scales or Pease had the power to create an opening for Olin.

On the basis of what we have read, we agree with the district court that one can read Scales' promise only as a promise to *try* to find a "great" agency for Olin; it could not be taken as a promise to *succeed*. We also agree that Scales cannot reasonably be taken to have promised Olin (in the

event of failure to find the agency) to keep Olin in his present job indefinitely. Thus, the directed verdict as to question 1 was proper.

### Questions 3, 4 and 5

■ Olin won a verdict on question 3, which reads as follows:

3. Quite apart from the so-called company policy, to be considered later, did Mr. Scales contractually promise plaintiff that he could stay on as Northeast agency vice president, for a reasonable length of time, in order to be able to choose an agency managership appearing elsewhere, if, in a reasonable time, one did?

He challenges the district court's decision setting aside the jury's affirmative answer on question 4 (whether Olin "would have obtained a better agency than Houston in a reasonable length of time") and its setting aside of the jury's $200,000 verdict (in response to question 5) while instead awarding about $20,000—the damages Olin suffered from loss of work until he found a job at Metropolitan. The relevant question here is not whether, if Scales had kept Olin in his present job for a longer time, Olin would have found a better agency than Houston. Rather, it is whether Olin would have found a better job managing a Prudential agency than the $75,000 job he found with Metropolitan thirteen weeks after leaving Prudential. We can find no evidence he would have done so.

Olin's salary in his current job with Prudential was $81,400. It is undisputed that agency managers were often (perhaps nearly always) compensated on the basis of a formula related to performance. Some made more money than $75,000; others made less. Scales and Pease looked for an agency for Olin, but, by March, they had come up with only Houston. By formula, Houston would have required Olin to take a significant cut in pay. Scales promised to guarantee Olin's current salary, but only for one year.

There is no evidence that any vacancy would occur in any agency likely to pay Olin more than $75,000. The record does contain references in passing to other vacancies that occurred from time to time—in Syracuse, Buffalo, the Merrimack Valley, Southern Connecticut and Poughkeepsie. But, it does not say what managers of those agencies earned. The only evidence about them—their location in the poorly performing Northeast—suggests that, as manager, Olin would have earned less money, not more. Olin also points to evidence of an opening in Los Angeles, an agency run by Nat Borokis, who was about to retire. But, there is no evidence Olin could have obtained this agency. It is undisputed that Los Angeles' home office already had plans to replace Borokis with someone other than Olin. A witness also testified, without contradiction, that "the manager's earnings" there "were not as high" as "Mr. Olin's salary at the time." Olin points out that Prudential promised Olin to guarantee his $81,400 salary for one year (and possibly longer) if he would take Houston. Houston, however, obviously carried enormous risks that in later years Olin would earn far less money than his current job, and that is why Olin rejected the Houston offer.

We therefore cannot find evidence that would allow the jury to conclude (without pure speculation) that, had Prudential kept Olin on for a more reasonable time, while continuing the search for a better agency, Olin eventually would have earned more than the guaranteed $75,000 per year that he received at Metropolitan. *A fortiori*, the record lacks any basis for the jury to assume Olin would have found so fine an agency, that he would have increased his salary by 10 percent each year. Yet, without some such assumption, one cannot come anywhere near the $200,000 damage figure that the jury found.

In an effort to sustain the jury's $200,000 damage award, Olin makes four additional arguments. We shall discuss each in turn.

■ 1. Olin says that he did not draw salary for thirteen weeks after he left Pru-

dential. This amounts to approximately one-fourth of his $81,400 salary for one year. The district court found damages of $21,605.43. And, we agree Olin was entitled to this sum.

2. Olin says if he had stayed with Prudential, he would have earned his present salary increased by 10 percent each year, which when compared with his Metropolitan salary, by the time of trial, amounted to a loss of $148,327. For the reasons just set out, we disagree. There is no evidence Scales would have succeeded in finding Olin so profitable an agency.

3. Olin says his termination lost him the proceeds of a special 3 percent Prudential Investment Plan Contribution—a contribution that should have yielded him an additional $13,449 by the time of trial. For the reasons stated above, there is no evidence that Scales would have succeeded in finding Olin an agency that would have brought him profits that exceeded his salary at Metropolitan. Thus, the jury could not have found that Olin lost this money. It seems undisputed, however, that Prudential would have contributed 3 percent additional to Olin's salary during the 13 weeks it should have kept him on. This amounts to an additional $610. (We note, however, that the parties have agreed to amend the judgment, perhaps to reflect this figure. If not, the judgment should be modified to reflect the additional sum.)

4. Olin says the jury should have awarded an additional $18,000 for "dislocation expenses, expenses in finding new employment, and the value of his longevity with Prudential as opposed to starting a new job with Metropolitan at the age of fifty-four. (A 361–62, 1053–1074, 1100–1118)." This figure cannot justify a jury verdict of $200,000. If Olin means his argument as a request to increase the judgment by $18,000, his support is inadequate. His citations to the record refer to the verbatim texts of two insurance policies. He does not tell us precisely how these policies make a difference in his compensation. We shall not try to make this determination on our own.

In sum, the district court correctly concluded that the jury's $200,000 verdict could not be supported by the evidence. And Olin fails to show on this appeal any significant error in the district court's own calculation of damages.

*Questions 6 through 9*

Olin says that the court should not have set aside the jury's answers to questions 6 through 9, to the effect that Prudential, in dismissing Olin, breached a contractually binding company termination policy that required it, before dismissing an employee, to point out failings, and to give the employee a probationary period to improve. The parties in their briefs argue about whether this termination policy can be read into the contract of an "at will" employee; they also argue about whether Prudential substantially complied with that policy. We need not address these arguments, however, in light of the fact that the district court set aside the jury's findings for the following reason: "Such [termination policy] rights, if any, were exchanged or waived."

We need not pause over possible technical interpretations of the word "waived" in this sentence because the record fully bears out the court's decision in terms of its preceding word, namely, the word "exchanged." The court reasoned that in saying, "[A]s long as I get a good agency, I'll agree to this," Olin must have meant he would agree to what Scales was proposing as the way for Olin to leave his present job. No reasonable person could think that Olin and Scales, who had dismissed other employees and hence were likely familiar with the Prudential's termination policy, meant to agree that Olin would stay in his present job for a reasonable time and then, *after that,* Olin would have an additional probationary period to improve his performance. Olin points to nothing in the record that invalidates this reasoning. Thus, we agree with the district court.

### Prudential's Cross-Appeal on Question 3

Prudential, in a cross-appeal, says that the district court should have directed a verdict in its favor on question 3 because: a) no reasonable juror could have believed that Scales meant his side of the January 7 conversation to be taken as an enforceable contractual promise, and because b) no reasonable juror could have believed that Prudential failed to keep Olin in his current job for a reasonable time. Prudential adds that there is no evidence from which a reasonable juror could have decided (without pure speculation) how long a time was "reasonable."

After having read the cited portions of the record and the district court's opinion, however, we agree with the district court's contrary conclusions. A juror might have believed that Olin reasonably took Scales as having made a promise. After all, Olin said, "I'll agree to this," without any suggestion by Scales that his remark was inappropriate. And, the jury might have taken Olin to have been giving up whatever other rights he had—social or institutional, if not legal—as consideration for Scales' promise. The jury might reasonably have thought that Scales dismissed Olin too soon; he did not make sufficient efforts to find Olin a "great agency." Olin had worked for Prudential for almost seven years; he was a high executive official, and two months of effort might reasonably have seemed not long enough. Moreover, the Houston agency, which Scales found, was in poor condition, and Scales gave Olin only one single day to make up his mind about Houston. The descriptions of Olin's responsibilities, the search efforts by Scales and Pease, the nature of insurance agencies, and other evidence about business practice and expectations that the record contains are sufficient to support the district court's conclusion that Prudential ought to have kept Olin on, at least through June.

Prudential also argues that the district court should have deducted (from its award of thirteen weeks' worth of pay) the seven weeks of severance pay and five weeks of vacation pay that Prudential paid to Olin when he left. But, if Prudential had lived up to its promise and kept Olin on for a "reasonable time," after which (failing to find a "great agency") it dismissed him, Olin would have received his regular pay and then also received severance pay and earned vacation pay to boot. So we do not understand the basis for any deduction.

## II

### Olin's Sex-Discrimination Claims

Olin claimed that Scales' decision to dismiss him arose out of Olin's effort, on one occasion, to prevent subordinates from sexually harassing female employees. He says that a dismissal for this reason violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), and also the Massachusetts Fair Employment Act, Mass.Gen.Laws Ann. ch. 151B. The district court, sitting without a jury, found against Olin on these claims, and Olin attacks that finding.

Olin first says he was entitled to a jury trial. He is wrong, however, for it is well established that Title VII, being essentially equitable in nature, does not carry with it the right to trial by jury. *Lehman v. Nakshian*, 453 U.S. 156, 164, 101 S.Ct. 2698, 2703, 69 L.Ed.2d 548 (1981); *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 375 & n. 19, 99 S.Ct. 2345, 2350 & n. 19, 60 L.Ed.2d 957 (1979). The cases Olin cites to the contrary, *Sisco v. J.S. Alberici Construction Co.*, 655 F.2d 146 (8th Cir.1981), *cert. denied*, 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982); *McCray v. Standard Oil Co.*, 76 F.R.D. 490 (N.D.Ill.1977), are not in point. They hold only that, where Title VII claims are mixed with other, legal claims, plaintiff is entitled to a jury trial on the *other* claims; they do not hold that a plaintiff is entitled to a jury trial on the Title VII claim.

The court also properly rejected Olin's claim for a jury trial on the state claim, for the relevant state statute, Mass. Gen.Laws Ann. ch. 151B, § 9, contains words ("[i]f the *court* finds") that the State

Supreme Judicial Court has held signify a legislative intent to provide equitable, not legal, rights. *Nei v. Burley*, 388 Mass. 307, 312, 446 N.E.2d 674 (1983) (no right to jury trial under Mass.Gen.Laws Ann. ch. 93A, § 9, which contains language identical to that of ch. 151B, § 9). Prudential objected quite late to Olin's claim for trial by jury, but the district court reasonably found that Prudential did not realize earlier that Olin wanted a jury trial on these particular claims.

 Finally, Olin argues that Scales must have wanted to remove him for "sex discrimination" reasons because there is inadequate evidence that he was incompetent. The record is replete, however, with evidence that Scales believed Olin was incompetent. The district court could reasonably find that Scales' belief that Olin showed poor ability in managing his employees led Scales to dismiss Olin. That finding is sufficient to make any conduct related to legally impermissible discrimination irrelevant to the discharge, defeating Olin's claim.

For these reasons, the judgment of the district court is

*Affirmed.*