MacDonald, D. Lloyd, J.
Nature of the Dispute and Procedural History
Before the Court are the 93A claim and counterclaim of the parties arising out of a commercial lease dispute between the Plaintiff Plastics Color & Compounding, Inc. (“Plaintiff or “PCC”) and the Defendants Henry Coz and Coz Really (“Defendants” or “Coz”). Coz was the landlord and PCC the tenant. The premises at issue was 260,000 square feet of a manufacturing facility owned by Coz on Providence Road in Northbridge (“the Premises”). A jury trial on the common-law claims sounding in constructive eviction and breach of contract resulted in a verdict for the Plaintiff of $850,000, representing the Plaintiffs relocation costs. The jury also returned a verdict in the Defendants’ favor of $125,000 on that portion of the Defendants’ counterclaim that related to the Plaintiffs failure to have returned the Premises to its condition as of the outset of the tenancy.
The jury was also instructed on the 93A, §11 claim and counterclaim, and the jury returned verdicts of no liability on both the claim and counterclaim. However, because, on its review of the jury verdict form, the Court concluded that the Court had erred in the way that it had posed the 93A liability issue on the form, the Court invited briefing and argument on the 93A issues as if the Court had reserved the issue from the outset. Nei v. Burley, 388 Mass. 307, 311-15 (1983). See Procedural Order re 93A Claims (March 31, 2005).
Both parties submitted memoranda in response to the Court’s procedural order, and a hearing was held. What follows is the Court’s decision on the 93A issues, with the Court having taken such submissions and arguments into account in light of the totality of the evidence at the two-week trial.
Findings of Fact
In 1959 Coz founded a successful thermoplastics business, Coz Plastics, Inc. (“Coz Plastics”) and operated the business in the Premises, a 19th-century Blackstone Valley mill complex that had been converted to a modem manufacturing facility.
In 1968 Coz sold Coz Plastics to Allied Products Corporation of Chicago (“Allied”). However, Coz retained the Premises, and thereafter (in the name of Coz Realty Trust, hereinafter, “Coz Realty”), Coz leased the Premises to Allied. As part of the Allied transaction, Coz entered into an employment agreement with Allied whereby Coz continued to run the day-to-day business of Coz Plastics as its CEO, subject to Allied’s corporate oversight. However, Coz and Allied’s management before long had a falling out, and in on or about 1995 Coz relinquished his executive functions at the company. Nevertheless, Allied continued to operate Coz Plastics at the Premises, and Coz remained Allied’s landlord.
PCC is also a plastics manufacturer. In 1997 PCC acquired Coz Plastics from Allied. In doing so, it assumed Allied’s lease to the Premises. Coz was not involved directly in the asset sale, but Coz was a party to an agreement concurrently executed (the “Consent”) whereby PCC succeeded Allied as tenant. Pursuant to the Consent, Coz acknowledged PCC’s assumption of the lease. The Consent further recited that PCC’s liability under the lease was limited to “facts and situations” affecting the Premises that occurred after the effective date of the asset purchase.
Allied, nevertheless, remained obligated on the lease in the event that PCC failed to perform its leasehold obligations. Allied also remained obligated as to those duties arising under the lease that related to the “facts and situations” that occurred prior to PCC’s assumption of the lease (and, thus, for which PCC was not responsible pursuant to the carve-out provision in the Consent). The most significant of these obligations related to the duty to maintain, repair and replace the leasehold space such that at the conclusion of the lease the space would be substantially in the same condition as existed at the outset of Allied’s tenancy.
However, within several years Allied went bankrupt. The result was that as the dispute under the lease between PCC and Coz unfolded, as will be described in detail below, Coz was eventually left with recourse solely against PCC.
During the course of its tenancy, PCC’s thermoplastics business occupied approximately 65% of the Premises. The next largest tenant was another manufacturing business, Polyfoam, the principal owners of which were Coz and one of his sons. In addition to a fixed rent obligation, the lease provided that PCC (as Allied had before) was to be charged “Additional Rent” in connection with utilities and other costs for “that *466 portion which the square footage of the Leased Property bears to the square footage of the buildings of which the Leased Property is a part.” I.e., PCC was obligated to pay 65% of the utilities and related charges generated at the Premises.
After PCC’s purchase of Coz Plastics from Allied, tensions developed between PCC and Coz as landlord. Among other things, without notice or consent from PCC, Coz dismantled and did not replace a plumbing “tower” on the Premises, which PCC’s employees regularly used for showers and personal hygiene in connection with the manufacturing process. Similarly, Coz bricked up 48 windows that PCC relied upon for sunlight and ventilation in the course of construction of expanded space for Polyfoam. As part of the same project for Polyfoam, Coz also dismantled a fire escape that serviced one of PCC’s manufacturing floors.
PCC believed that in doing these things, Coz was intentionally disadvantaging PCC’s operations in favor of Polyfoam. As noted earlier, Polyfoam was the second-largest tenant in the Premises and was partially owned by Coz.
Further, before long PCC became concerned about the structural integrity of the Premises and its sufficiency for supporting PCC’s manufacturing operations. PCC engaged a structural engineering firm to evaluate the Premises. The firm concluded that there were major structural weaknesses to the building. As a result, PCC thereafter adjusted its storage and internal transport practices in connection with the manufacturing process to reduce loads on the structure of the Premises.
Meanwhile, PCC’s relationship with Coz deteriorated acutely when in 1998 PCC discovered that Coz Realty was charging PCC as Additional Rent 100% of the utilities of the larger Premises rather than for just the 65% of the Premises actually occupied by PCC. PCC immediately protested to Coz personally and through counsel.
However, Coz responded by informing PCC that he had always charged Allied for 100% of the utilities notwithstanding the written terms of the lease. Coz asserted that Allied was aware of and approved the practice. Coz’s lawyer wrote to PCC in response to its protest that “to the extent that the provisions of the written lease are inconsistent with the foregoing, it is [Coz’s] position that the lease has been modified to reflect the course of conduct of the parties.”
PCC contacted Allied, and Allied flatly contradicted Coz and stated it had never been aware of the practice. In a letter to PCC’s lawyer in late 1998 stating Allied’s position in this regard, counsel for Allied reminded Coz’s lawyer of the provision in the lease requiring that any modification of its terms be in writing. And at trial PCC introduced a 1985 letter from Coz himself to an executive at Allied that Coz Plastics (owned by Allied but managed at the time, as noted above, by Coz) was paying only its “proportionate share” of the heating costs of the building.
In response to its discovery of Coz’s practice as to Additional Rent, PCC began to withhold that portion of the Additional Rent it was being charged beyond PCC’s 65% share. However, Coz (via counsel) threatened PCC with immediate termination of the lease if PCC did not resume payment of 100% of the utilities. Because the lease contained a clause giving Coz the right of entry to repossess the leased premises in the event of a breach, PCC decided that it could not risk even a temporary interruption of its business operation. (Among its direct competitors was another Cozrelated entity, ECM Corporation.)
The combination of the above circumstances led PCC to conclude that Coz had breached the quiet enjoyment covenant of the lease. PCC informed Coz that it would be leaving the Premises. Thereafter PCC found an alternative facility in Connecticut, to which in 1999 PCC began relocating its manufacturing operation. However, PCC continued to pay rent through November 1999, which was when PCC finally left the Premises. The term of PCC’s lease as assumed from Allied was to have been to December 31, 2000, i.e., PCC vacated the Premises with 13 months remaining on the lease.
As to the Additional Rent PCC, under protest, continued to pay 100% of the utilities. (Coz made two additional threats of termination if PCC did not do so.) However, as PCC’s operations at the Premises wound down in late 1999, PCC applied the $119,000 accumulated Additional Rent overcharges to its regular monthly rent obligations. Thus, at the time PCC left Coz’s Northbridge facility for good, PCC had taken the overcharges as rent “credits.”
During its tenancy PCC had paid Coz over $1.4 million in rent.
The Claims and Counterclaims
The current litigation immediately ensued after PCC’s departure from Northbridge. Allied was originally a party, but Allied was dropped from the case after its bankruptcy.
As noted earlier, in addition to its 93A claim, PCC sued Coz for its relocation costs and other damages predicated on the alleged constructive eviction and breach of contract. Coz counterclaimed for- PCC’s alleged breach of the lease. Coz claimed damages in the form of the rent owed through the term of the lease to December 30, 2000 and for PCC’s alleged breach of its obligation under the lease to maintain, repair and replace items in its leasehold space and for its breach of the obligation (upon its departure from the Premises) to return the Premises to the condition it was at the outset of PCC’s lease.[1]
Also as noted earlier, the juiy found that Coz had constructively evicted PCC and awarded damages of *467 $850,000. This amount roughly approximated PCC’s relocation costs to its new facility in Connecticut.
The jury found, as well, however, that PCC had breached its obligation under the lease with regard to repair and restoration. But the amount the jury awarded to Coz in damages ($125,000) was a fraction of what Coz had claimed. More significantly, the jury separately found against Coz on that portion of his counterclaim alleging that PCC had breached the lease by leaving prematurely and failing to pay rent in the December 1999-December 2000 period.
The Issue Presently Before the Court
What remains to be addressed is the parties’ respective 93A, §11 claims. For the reasons that follow, the Court concludes that Coz failed to prove a 93A violation. However, the Court further concludes that PCC clearly established unfair and deceptive practices under 93A, §2 that were knowingly and willfully committed by Coz. The Court orders that the damages awarded by the jury to PCC be doubled and that Coz pay PCC’s attorneys fees and costs in prosecuting its claims.
Controlling 93A Principles
In evaluating whether a practice is unfair in a G.L.c. 93A, §11 claim, a court assesses “(1) whether the practice ... is at least within the penumbra of some common-law, statutoiy or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; [and] (3) whether [the conduct] caused substantial injury . . .” PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). In deciding whether a certain practice is “unfair” under G.L. 93A, “the nature of [the] challenged conduct and the purpose and effect of that condúct [are] the crucial factors ...” Massachusetts Employers Insurance Exchange v. Propac-Mass., Inc., 420 Mass. 39, 42-43 (1995). “[C]onduct in disregard ‘of known contractual arrangements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.” Anthony’s Pier Four, Inc. v. HBC Associates, et al., 411 Mass. 451, 474 (1991).[2] The Appeals Court has recently identified the element of “active” misrepresentation or deceit as particularly salient. Lily Transportion Corp. v. Royal Institutional Services, Inc., et al., 64 Mass.App.Ct. 179, 187 (2005).
However, the multiple damages provision of the statute is reserved for particularly egregious conduct. “[The statute] ‘ties liability for multiple damages to the degree of the defendant’s culpability by creating two classes of defendants.’ Those defendants who have committed ‘relatively innocent violations’ of the statute are not liable for multiple damages, while a second class of defendants who have committed ‘willful or knowing’ violations are.” DataComm Interface v. ComputerWorld, Inc., et al., 396 Mass. 760, 779 (1986).
A “willful or knowing” violation is one where either the defendant affirmatively knew that a material representation was false or that the defendant made the representation with reckless disregard of its truth or falsity. See Shaw v. Rodman Ford Truck Center, Inc., 19 Mass.App.Ct. 709, 711-12 (1985). See also Anthony’s Pier Four, supra, at 475.
Rulings of Law
As to Coz’s 93A counterclaim against PCC, there is no basis to find unfair and deceitful conduct by PCC. Coz argued that PCC’s constructive eviction allegations were simply a pretext for PCC to get out from under its lease obligations in order for PCC to transfer its operations to a newer and more efficient manufacturing facility in Connecticut.
I find, however, that there was no credible evidence of pretext. The Court’s finding in this regard is not inconsistent with the jury’s verdict as to PCC having failed to live up to its obligations to return the Premises to its condition as of 1997. As noted above, a simple breach of contract, without more, does not comprise a 93A claim. Framingham Auto Sales, Inc. v. Workers’ Credit Union, 41 Mass.App.Ct. 416, 418 (1996). I choose not to disturb the jury’s verdict awarding Coz $125,000 in damages, but I rule that PCC’s breach was devoid of the distinguishing characteristics of unfair and deceptive acts under 93A as related above.
Coz’s conduct, on the other hand, is a different story. Having heard the testimony at trial, having examined the exhibits and having taken the measure of Coz’s demeanor on the witness stand, I find as a fact that Coz had no good-faith basis to charge PCC for 100% of the utility costs when PCC’s share should have been 65%. Coz’s defense that Allied had agreed to the practice was contradicted by Allied, was unsupported by the contract documents and defies common sense. The inference is inescapable that Coz as the principal of Coz Realty was bilking, first, Allied, and, then, PCC for his own and Coz’s related companies’ benefit.
Coz’s reaction to having been found out by PCC— namely, to threaten PCC with immediate termination of the lease and exercise of Coz as landlord’s right of entry — is just the kind of insidious overbearing and coercive conduct from which it is the object of c. 93A to protect honest commercial actors. Propec-Mass., supra, at 43. See also Lily Transportation, supra, at 187.
Moreover, the facts here bear an almost uncanny resemblance to those in the Appeals Court’s decision in Diamond Crystal Brands, Inc. v. Backleaf, LLC, 60 Mass.App.Ct. 502, 507-08 (2004). There, aperse93A violation was found when “coercive and extortionate” threats to evict a commercial tenant followed the tenant’s having validly objected to overcharges by the landlord for the cost of utilities.
*468 Coz’s unfair and deceptive acts were willful and knowing. Moreover, they did not take place in a vacuum, but, rather, as but one component of a broader pattern of commercially indefensible conduct that rendered untenable PCC’s position at the Premises. I find that doubling the juiy’s damage award is an appropriate remedial sanction. Attorneys fees and costs shall also be assessed on account of the above findings and rulings.
ORDER
Judgment shall enter for the Plaintiff on its 93A count. Damages in the amount of $1,700,000 are awarded plus reasonable attorneys fees and costs. The Plaintiff shall file an affidavit with regard to the latter within 14 days of the entry of this order. Judgment shall also enter for the Plaintiff on the Defendants’ 93A counterclaim.

 Coz’s original claim against PCC included damages for the cost of the restoration of the Premises to the condition the Premises as it was in 1985 at the outset of Allied’s original lease. However, Fishman, J. of this Court granted PCC partial summary judgment on that issue, ruling that, pursuant to the Consent executed by Coz, PCC was obligated to restore the Premises only to the condition existing as of its 199 7 purchase of Coz Plastics from Allied.

 “While it is correct that a breach of contract alone does not amount to an unfair act or practice under G.L.c. 93A, §2, conduct undertaken as leverage to destroy the rights of another party . . . has a coercive quality that, with the other facts, warranted a finding of unfair acts or practices.” PropecMass., supra at 43.