Giles, J.
Introduction
The instant action concerns the enforceability of a July 2, 1998 purchase and sale agreement between plaintiff Lauriston Ward (“Ward”) and defendant William Costello (“Costello”) relative to the former’s land in Carlisle, Massachusetts. Over two years ago, Ward’s then principal argument — that the agreement violated public policy in contravention of G.L.c. 61, §8 (Counts I and II) — was met with disapproval by another judge of this court. See Memorandum of Decision and Order on Cross-Motions for Partial Summary Judgment, Sosman, J., dated August 3, 2000 (“Decision”).[2]
With leave of that court, the parties now have filed further motions for summary judgment: Costello’s motion is addressed to his counterclaim for specific performance (Counterclaim Count II)[3] and to Ward’s additional counts for misrepresentation and fraud (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), breach of fiduciary duty (CountV), civil conspiracy (Count VI), and violation of G.L.c. 93A (Count IX); and Ward challenges Costello’s counterclaim for a G.L.c. 93A violation (Counterclaim Count IV). In addition, defendants Brigitte Senkler (“Senkler”), Senkler Real Estate, Inc., and Senkler Hunneman Real Estate, Inc., have moved for summary judgment on Ward’s claims for fraud and misrepresentation (Count III), civil conspiracy (Count IV), breach of fiduciary obligation (Count VII), violation of G.L.c. 93A (Count VIII), and respondeat superior (Count X).
Background
The following supplements Judge Sosman’s extensive factual summary in her Decision.
In 1960, Ward inherited a 57-acre lot on Cross Street, Carlisle, Massachusetts. He had never worked in the real estate business but hoped he could “maximize his return” on the land. In the 1960s, he began investigating the value of the properly and, in the 1970s, hired engineers to perform percolation (“perc”) testing on the land.[4] The land consistently “failed” the perc tests and yielded only one buildable lot.
In 1981 and 1983, Ward received tax abatements from the town because the value of his land was “much lower” than the actual appraised value. In 1983, the assessed value of the land was $193,000.00. In 1984, he classified the land as “forest land” under G.L.c. 61, thereby entitling himself to the property tax reduction benefit established by G.L.c. 61, §3. In 1990, a company named Landvest opined that, based on the perc tests submitted by Ward, his property was “heavily constrained” and, hence, not developable.
In.the summer of 1997, Costello contacted Senkler, a real estate broker with whom he did business, to express his interest in purchasing Ward’s land. Senkler informed Costello that the land was undevelopable and that it had a troubled soil history; however, she offered to introduce him to Ward. Senkler contacted Ward and proposed Costello’s offer of $1.5 million for the land. According to Ward, Senkler, in their first conversation, “made only one remark that bears [on her role in the transaction], and that is that there would be no broker.” Likewise, Costello made clear to Senkler that he was not enlisting her as his broker because he had no interest in paying a commission. Costello and Ward agreed to meet at Senkler’s office on June 6, 1997.
Senkler was not present in the conference room when Costello and Ward discussed the potential sale. When she entered the conference room to greet the two men, Ward asked, “How do you get paid?” Senkler replied that she was just introducing them and, therefore, no commission was due and payable. She further informed Ward that, notwithstanding the lack of commission, she “hoped” to obtain future listings if Costello developed the property; however, Senkler never asked Costello for the listings. Costello and Senkler never entered into an agreement for a broker’s commission on the sale of the land.
At the meeting on June 6, 1997, Costello offered Ward $1.5 million for his 57 acres; and Ward was “veiy pleased” and “happy” with the price offered. Before the meeting with Costello, Ward felt that the land was not “percable,” or developable, and, consequently, did not have sufficient market value. At no time did Ward disclose to Costello that the land yielded unsuccessful perc testing.
After the meeting, Ward wanted to review the proposed option contract and asked Senkler for a recommendation of an attorney. That contract, dated June 6, 1997, contained the following language: “[i]t is further agreed between the parties that no entiiy or *645 person is acting in the capacity of a real estate broker in this matter and no commission shall be paid.” Senkler recommended two attorneys, one in Acton and the other in Concord; Ward, however, wanted an attorney in Wellesley, where he resided. Senkler then recommended James Parent (“Parent”), an attorney with the firm of Parent & Godoff, who became Ward’s legal representative. After his consultation with Parent, Ward signed on July 7, 1997, the proposed option agreement (“July Agreement”), under which Ward received a payment of $16,000.00, the first of four non-refundable payments, with the further understanding that Costello could investigate the land. The July Agreement contained the following clause; “[i]t is further agreed between the parties that no entity or person is acting in the capacity of a real estate broker in this matter and no commission shall be paid.”
Ward inquired of Parent about the relationship between Costello and Senkler. Parent speculated that Senkler hoped for future listings from Costello. Parent called Senkler and asked if she, indeed, was Costello’s broker. Senkler told Parent that she had represented Costello in other subdivisions but had no current relationship with Costello regarding Ward’s land. Senkler then sent Parent a marked-up copy of a 1988 listing she had for Costello.[5] Senkler never showed the document to Costello or Ward.[6] Costello and Senkler never discussed the terms of any listing she might obtain upon his purchase.
In the fall of 1997, one of Costello’s engineers, Joseph March (“March”), confirmed that access to the land was going to be “difficult.” Costello contacted Senkler and informed her that testing had not gone well, that there were upland access issues, that additional land may be needed, and, for these reasons, that he wanted a reduction in purchase price. According to Ward, Senkler told him that Costello “investigated further” and that “further access was desirable and perhaps almost necessary.” She asked for a reduction in price of $350,000.00. Ward declined the request. Senkler then arranged a meeting between Ward and Costello, which she did not attend. At the meeting, Costello told Ward that a second access would be highly advisable because the wetlands gave limited access to the property. Ward again refused to reduce the purchase price.
Approximately two weeks later, Ward contacted Costello and agreed to a price reduction of $100,000.00. Despite having the opportunity to do so, Ward did not seek advice from either Senkler or Parent. He did not speak with Costello after their meeting, did not contact another real estate broker, did not hire an appraiser, and did not speak to anyone in the town regarding access to the wetlands before he agreed to reduce the price. In his own words, he arrived at the sale price by “intuition.”
On September 30, 1997, Costello and Ward entered into a new option agreement for the sale of Ward’s fifty-seven acres of property for a total price of $1,461,000.00 (“September Agreement”). The September Agreement included the hereinbefore mentioned clause that specified that there was no real estate broker involved in the transaction.
Four months later, in January of 1998, Ward received a telephone call from Michael Anthony (“Anthony”), a real estate broker. Although Ward would not disclose the status of his land, Anthony nonetheless requested a meeting. At the encounter, Anthony informed Ward that the “price was too low” and recommended that he get a second legal opinion. Anthony further suggested that Ward consider an Internal Revenue Code Section 1031 exchange for property valued from $2.5 million to $3 million. Ward and Anthony met with Steven Lindsay, an attorney at the firm of Ropes & Gray, to determine if there was a legal theory under which Ward would not be bound by the September Agreement. Lindsay declined to represent Ward. Ward and Anthony then met with Eric Eisenberg (“Eisenberg”), an attorney at the firm of Hinckley, Allen & Snyder. From his first conversation with Eisenberg, Ward’s desire was to avoid the agreement.
Fred Conroy (“Conroy”), Costello’s attorney, contacted Parent because Costello was ready to execute the September Agreement and purchase Ward’s land. Ward asked Eisenberg’s advice as to whether to sign the final purchase and sale agreement (“P&S”), as he no longer trusted Parent. Eisenberg does not specifically recall what advice he gave; however, the relationship between Eisenberg and Ward terminated thereafter. Anthony then called Francis Balas, an attorney at the firm of Balas, Alphen & Santos, to review the P&S. Ward conceded that, at the time he signed that agreement, he knew through Anthony that comparable sales were fetching higher prices per acre; nevertheless, he signed the P&S on July 2, 1998. Just like the July and September Agreements, the P&S expressly stated that no real estate broker was involved in the transaction.
To date, Ward’s land remains unsold to Costello or anyone else.
Discussion
I. Summary Judgment Standard
Summary judgment is appropriate when there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The party moving for summary judgment has the burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. See Community Nat’l Bank v. Dawes, 369 Mass. 550, 554 (1976). If the non-moving party in a summary judgment action, who has the burden at trial, has not proven a reasonable expectation of proving an essen *646 tial element of that party’s case, then summary judgment is appropriate. See Kourouvacilis v. General Motors Corp., 410 Mass. at 716. In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party. See G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991).
II. Fraud and Misrepresentation
Summary judgment is appropriate when the non-moving party fails to introduce competent evidence of an essential element of a claim. See Kourouvacilis, 410 Mass. at 716. The elements of fraud are: (1) a false representation, (2) of a matter of material fact, (3) with knowledge of its falsity, (4) for the purpose of inducing action thereon. See Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982); see also Alpine v. Friend Brothers, Inc., 244 Mass. 164, 167 (1923).
The defendants[7] assert that they never made false representations of material fact to Ward and, further, that all their statements are non-actionable opinions; therefore, summary judgment is appropriate as a matter of law. Ward counters that Senkler and Costello fraudulently represented the following: (1) Senkler’s relationship with Costello, (2) the value of Ward’s land, and (3) the fact that the perc tests “came out poorly.” Ward also alleges that Costello fraudulently induced him into signing a contract for the property at a reduced price.
A.Relationship Between Costello and Senkler
The defendants are entitled to summary judgment in this regard for the simple reason that Ward does not have a reasonable expectation of proving that Senkler and Costello misrepresented their relationship. See Kourouvacilis, 410 Mass., supra. In fact, all the evidence in the record points to the contrary. Throughout the course of the negotiations between Ward and Costello, Senkler maintained that she represented no one and was acting merely as a facilitator. In her first conversation with Ward, Senkler explicitly told him that she was no one’s broker and only “hoped” for future listings from Costello. There is no evidence that Costello ever consented to Senkler acting as his exclusive broker; and Senkler never received a commission nor signed a broker’s agreement with Costello in relation to the purchase of Ward’s property.[8] In addition, each agreement containing Ward’s signature (July Agreement, September Agreement, and P&S) clearly stated that no real estate broker is involved in the transaction. Accordingly, as Ward will be unable to prove that Senkler and Costello made a false representation, summary judgment is appropriate for the defendants in this regard.
B.The value of Ward’s Land
Senkler seeks summary judgment because she did not falsely represent the value of Ward’s land.[9] Ward, on the other hand, claims that each statement made by Senkler concerning the value of his property gives rise to fraud and, thus, liability on her part. The court agrees with Senkler.
Property value estimates or, false statements concerning market value are opinions, judgment, or “seller’s talk,” none of which is actionable. See Yerid v. Mason, 341 Mass. 527, 530 (1960); Gaucher v. Solomon, 279 Mass. 296, 299 (1932); Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 410 (1991). Furthermore, the statements made by Senkler to Ward regarding the value of his property do not lead to a reasonable inference that Senkler knowingly communicated a false material fact. See Gaucher v. Solomon, 279 Mass., supra. At the time she expressed the value of Ward’s land, Senkler knew that the perc test results performed by Ward throughout the 1960s, 1970s, and 1980s were unsuccessful. Additionally, in her initial conversation with Costello, Senkler cautioned him that the land was undevelopable and had a troubled soil history. Based on these facts, it is unreasonable to infer that in 1997 Senkler knew the price offered was below market value without engaging in pure speculation.
Moreover, at the time he received the offer, Ward was “very pleased” and “happy.” Based on the unsuccessful attempts to develop the land, he assumed that $1.5 million was a fair price. It is reasonable to infer that, since Ward’s frequent testing yielded unfavorable results and he received tax abatements from the town by claiming that “the value of the land [was] much lower than otherwise,” Ward himself did not believe the land to be worth very much. He provides only bare assertions that Senkler falsely represented the value of his property. Absent evidence to the contrary, his mere contentions are insufficient to show a likelihood of success at trial; and, thus, summary judgment is proper.
C.Results of the Testing and Fraudulent Inducement
The defendants aver that summary judgment is proper on this score because Ward did not provide evidence supporting his allegations of fraud and fraud in the inducement concerning the results of the testing on the property. Ward, in turn, alleges that a genuine issue of material fact exists as to the test results because (1) March, Costello’s engineer, claimed that the testing had gone rather well; (2) Ward, in his second amended complaint, asserted that Senkler and Costello said the “testing came out poorly”; (3) Costello told Ward that there were access problems and that he needed to reduce the price; and (4) Ward thought the deal would terminate had he not reduced the price. The defendants’ reasoning once again prevails here.
The elements required to prove fraud in the inducement are: (1) a misrepresentation of material fact, (2) made to induce action, (3) and reasonable reliance on the false statement to the detriment of the actor. See Commerce Bank & Trust Co. v. Hayeck, 46 Mass.App.Ct. 687 at 692 (1999), citing Hogan v. Rie *647 mer, 35 Mass.App.Ct. 360, 365 (1993). “Reliance is an element of actionable fraud.” Nei v. Burley, 388 Mass. 307, 311 (1983), citing Kilroy v. Barron, 326 Mass. 464, 465 (1950).
Ward refused to reduce the price when Senkler called him and allegedly informed him that the results came out poorly. At his meeting with Costello, Ward refused to reduce the price again after hearing Costello’s reasons first-hand as to why a price reduction was warranted. Finally, two weeks after Ward and Costello met, Ward contacted Costello and agreed to a $100,000.00 price reduction, which was $250,000.00 less than Costello’s original request. During the two weeks of deliberation, Ward did not contact Senkler or Parent, even though he understood he could, did not consult the test results, and did not hire an appraiser; and there is no indication that he spoke with March about his findings made in fall 1997.[10] In the end, he made the decision based on “intuition,” not reasonable reliance.
Given that reliance is an essential element of fraud, it is unreasonable for Ward, having the opportunity to consult test results and speak with his attorney, allegedly to have relied on the purported statements by Costello and Senkler to make his decision to reduce the purchase price. See Nei v. Burley, 388 Mass. at 311 (seller and broker knew of seasonal stream and did not tell buyer; but buyer saw a report of the tests, met with the land surveyor, and then signed the purchase and sale agreement; buyer’s failure to ask the land surveyor about the tests demonstrated that she did not rely on any representation of the defendants). As a matter of law, Ward’s reliance on the statements was unsound, given his ample opportunity to view the results and to consult with professionals who specialize in real estate.
Furthermore, the evidence in the record supports the conclusion that Senkler’s statement about the testing constituted a mere opinion. Senkler spoke with Costello who, with first-hand information about the results, informed her that he needed to purchase additional land because of the negative information contained in the results; and she conveyed Costello’s position to Ward. Senkler did not investigate the results and did not question their validity. In addition, Senkler knew of the troubled soil history relating to the property. It is reasonable to infer that Senkler believed that the tests done by Costello yielded results similar to those over the previous thirty years. For all these reasons, the representation made by Costello, passed on to Ward via Senkler, would not subject them to liability. Accordingly, summary judgment is appropriate for the defendants in this instance.
III. Civil Conspiracy
Ward complains that Costello and Senkler misrepresented the latter’s “true role” in the transaction and together breached the implied covenant of good faith and fair dealing, thereby engaging in a civil conspiracy. The defendants counter that summary judgment is justified because the undisputed facts fail to establish the required elements amounting to a civil conspiracy. See Kurker v. Hill, 44 Mass.App.Ct. 184, 188-89 (1998) (holding that Massachusetts provides two ways to find civil conspiracy: the first one requires coercion, and the other depends on proof of underlying tortious acts in which two or more persons acted in concert and in furtherance of a common design or agreement). They contend that the facts supporting coercion and common plan or agreement are conspicuously absent from the record.
“The doctrine [of civil conspiracy] appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participant knew of the plan and its purpose and took affirmative steps to encourage the achievement of the result.” Stock v Fite, 13 Mass.App.Ct. 75, 82 n.10 (1982). Ward’s assertion that Senkler and Costello are guilty of civil conspiracy is grounded in ambiguous inferences unsupported by the record. The facts do not indicate that Costello and Senkler intentionally planned to deceive Ward. Moreover, the evidence does not support Ward’s allegation of conspiracy since Costello never promised Senkler compensation if the price was accepted, never offered her the potential listings if the sale succeeded, and never entered into an agreement with her for commissions regarding Ward’s property. Without anything more than conclusory reasoning to substantiate his claim for civil conspiracy, Ward has no likelihood of success at trial; and, therefore, summary judgment in the defendants’ favor is warranted. See Kourouvacilis v. General Motors Corp., 410 Mass. at 711.
IV. Breach of Fiduciary Duty
Ward contends that there are material facts in dispute regarding the defendants’ relationship to him; and, thus, summary judgment on his claim for breach of fiduciary duty is inappropriate. The defendants respond that summary judgment is proper because they were not agents for Ward and, therefore, no fiduciary duty exists. The defendants are correct.
The elements of breach of fiduciary duty are: (1) existence of a duty that is fiduciary in nature based upon the relationship of the parties, (2) breach of that duty, (3) damages, and (4) a causal connection between breach of the duty and the damages. See Hanover Ins. Company v. Sutton, 46 Mass.App.Ct. 153, 164 (1999). In order for a party to be a fiduciary, there must be mutual consent. See Kirkpatrick v. Boston Mutual Life Ins. Co., 393 Mass. at 645; Theos & Sons Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000). The Restatement (Second) of Agency, §15, specifically states, “[a]n agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act.” Furthermore, comment b adds: “[t]he agency relation exists only if the agent consents to it. *648 A person may, by his sole act, create a power in another to act on his account, but since agency is a fiduciary relation, it can exist only if the other accepts power.” Restatement (Second) of Agency §15, cmt. b.
There is not a scintilla of evidence that Costello ever acted as Ward’s agent or fiduciary; and neither defendant consented to a fiduciary relationship with Ward.[11] Additionally, Ward never asked Senkler to represent him, never paid her a commission, never listed his property with her, never had her show the property to Costello or any other buyer, and never gave confidential information to her. Similarly, Senkler did not ask Ward to be his agent, did not request that he sign a broker’s agreement, and did not act on his behalf. An agency relationship was not created simply because Senkler introduced Ward to Costello and sporadically assisted both of them in their negotiations.
Furthermore, Ward admits that, during their first conversation, Senkler told him there would be no broker involved in the sale. At a meeting on June 6, 1997, Senkler again advised him that she was not his real estate broker; and no brokerage contract was ever entered into. The July Agreement and its successor, the September Agreement, included the following clause; “(G) It is further agreed between the parties that no entity or person is acting in the capacity of a real estate broker in this matter and no commission shall be paid.” Additionally, the P&S entered into on July2,1998 contained similar language: “Broker’s fee: there is no real estate broker.” The undisputed facts demonstrate an absence of mutual consent, no existence of a fiduciary duty, and sufficient grounds for judgment as a matter of law in favor of the defendants on this count.
V.Violation of G.L.c. 93A Against Senkler and Costello
Ward argues that the “various wrongs” of Costello and Senkler, in conspiracy with each other, give rise to a violation of G.L.c. 93A.[12] He bases his claim on the identical set of allegations supporting his other claims. However, given that the court has found the defendants not liable of those wrongs as aforesaid, summaiy judgment for the defendants is proper.[13]
VI.Counterclaim for Violation of G.L.c. 93A, §11
Costello filed a counterclaim against Ward for violation of G.L.c. 93A, §11, alleging that the latter used unfair or deceptive acts or practices in trade or commerce. He maintains that Ward, a private individual who executed an agreement for the sale of real estate in a business context, can be sued for a violation of the statute. He further contends that the inquiiy into whether a private individual is a participant in a “business context” is a factual one to be decided by a factfinder. Ward moves for summaiy judgment on this count, arguing that he is a consumer, not a businessman, engaged in a private transaction and, as such, falls outside the scope of Chapter 93A as a matter of law.
Chapter 93A makes unlawful “unfair methods of competition” and “unfair or deceptive acts and practices in the conduct of any trade or commerce.” G.L.c. 93A, §2. The Supreme Judicial Court found that the applicability of G.L.c. 93A is subject to a “dual inquiiy.” See Szalla v. Locke, 421 Mass. 448, 451-52 (1995). First, the court assesses whether the interaction is commercial in nature and then evaluates whether the parties both engaged in “trade or commerce” and acted in a “business context.” Id. citing G.L.c. 93A, §11. This question requires a factually sensitive analysis that is determined on a case-by-case basis. See Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 26 (1997).
Relying upon Lantner v. Carson, 374 Mass. 606, 608 (1978), Ward claims that his property was inherited and, thus, that the sale of the family properly is strictly a private transaction. Like the plaintiff in Lantner, he submits that he is not engaged in the real estate business but, rather, is clearly a consumer involved in a private, nonprofessional transaction. However, the Supreme Judicial Court has held that G.L.c. 93A, § 11 does not require that a commercial transaction take place only in the ordinary course of a person’s business or occupation before its participants may be subject to liability. See Begelfer v. Najarian, 381 Mass. 177, 191 (1980). What is required is that the isolated transaction take place in a “business context.” See id. Therefore, depending on whether the isolated transaction took place in a business context, Ward could be liable under c. 93A.[14]
The evidence establishes that Ward sold his property to Costello for financial gain, attempted numerous times to set aside the agreement by consulting attorneys, claimed that the land was undervalued each time he sought out a consultation, and actively participated in negotiating the agreements with Costello and in setting aside the final P&S. Whether the sale of Ward’s land was done in a business context is a question of fact for a factfinder and, therefore, not amenable to summaiy judgment.
VII.Specific Performance
Costello seeks specific performance of the P&S, in which Ward agreed to sell his 57-acre property to Costello in exchange for $1,451,000.00. Ward argues that Costello is not entitled to specific performance because Costello breached the parties’ contract, fraudulently induced him into signing agreement at a reduced price, and has “unclean hands.” He also asserts that enforcement of the agreement is unconscionable because the sale price grossly undervalued the market price.
It is well settled in this Commonwealth that real property is unique and that money damages usually are inadequate to remedy a loss of an interest in land. McCarthy v. Tobin, 429 Mass. 84, 89 (1999), citing *649 Greenfield Country Estates Tenants Ass’n., Inc. v. Deep. 423 Mass. 81, 88 (1996). “Specific performance is a proper remedy to enforce a valid option to purchase real property.” Greenfield Country Estates Tenants Ass’n., Inc., 423 Mass. at 89. A judge has considerable discretion with respect to granting specific performance in disputes involving the conveyance of land. See Raynor v. Russell, 353 Mass. 366, 367 (1967). Specific performance, an equitable remedy, should not be granted in those special circumstances where it would impose an undue hardship on one party or allow the other to obtain an inequitable advantage. See Greenfield Country Estates Tenants Ass’n., Inc. v. Deep, 423 Mass. at 90 (citations omitted).
The evidence in the record supports the conclusion that Costello and Ward have an enforceable contract and that Costello is ready, willing, and able to perform. Ward, on the other hand, has failed to adduce sufficient facts to prove that he was deceived and tricked into signing the final agreement or that Costello and Senkler conspired against or misled him. On the contrary, he agreed to the selling price after due deliberation and extensive consultation with several attorneys and real estate brokers. Thus, there is a complete lack of evidence that Costello comes before this court with “unclean hands.” Moreover, the only party to suffer a hardship in this case is Costello, who has been deprived of his rightful ownership of this land for many years. Under the circumstances, the court finds that the remedy of specific performance of the P&S to be appropriate.
ORDER
For all the foregoing reasons, it is hereby ORDERED that:
1. Plaintiff Ward’s motion for summary judgment as to Costello’s counterclaim for violation of G.L.c. 93A (Counterclaim Count IV) be DENIED;
2. Defendant Costello’s motion for summary judgment as to Counts III (misrepresentation and fraud), IV (breach of implied covenant of good faith and fair dealing), V (breach of fiduciary duty), VI (civil conspiracy), and IX (G.L.c. 93A violations) of the complaint and as to Count II of his counterclaim (specific performance) be ALLOWED, and
3. The motion for summary judgment of defendants Senkler; Senkler Real Estate, Inc.; and Senkler Hunneman Real Estate, Inc. as to Counts III (misrepresentation and fraud), VI (civil conspiracy), VII (breach of fiduciary obligation), VIII (G.L.c. 93A violations), and X (respondeat superior) of the complaint be ALLOWED.

The court, Sosman, J., also found in Costello’s favor with respect to his counterclaim for declaratory relief under G.L.c. 231A (Counterclaim Count I).

Costello appears not to be pressing for judgment on his counterclaims for breach of contract (Counterclaim Count III) and violation of G.L.c. 93A (Counterclaim Count IV).

Perc testing, or measuring the rate at which water seeps through the bottom of a hole, provides an indication of a property’s development potential.

Ward denies that this agreement was a rough draft and contends that it was a broker’s agreement for future listings between Costello and Senkler. This bald assertion was unsupported by any facts in the record, however.

The first time Costello saw this document was in December 1999.

“Defendants” in this context refers to Costello and Senkler. Ward contends that defendants Senkler Real Estate, Inc., and Senkler Hunneman Real Estate, Inc., are responsible for the acts or omissions of Senkler under the doctrine of respondeat superior (Count X). Therefore, any liability of the corporate defendants would be wholly derivative of and determined by any liability on Senkler’s part.

Failure to show mutual consent is fatal to a claim alleging breach of fiduciary duty. See Kirkpatrick v. Boston Mutual Life Insurance Co., 393 Mass. 640, 645 (1985).

Ward claims that the following scenarios are all actionable: (I) when Senkler conveyed Costello’s offer of $ 1.5 million to Ward, he got the “impression” that the price was the fair market value; (2) Senkler failed to tell Ward that the $1.5 million was not a fair market price; (3) Senkler “convinced” Ward to accept the offer from Costello because she “touted” Costello as “very successful”; and (4), after Ward agreed to a price reduction, Senkler called Ward to congratulate him.

Ward also claims that Costello breached the implied covenant of good faith and fair dealing and induced him into a price reduction. However, the facts do not support his contention that Costello misrepresented the test results or that he wanted a reduction in price. It was Ward who agreed to the price reduction after two weeks of consideration. There is no evidence that Costello acted in bad faith, lied to, or did not deal fairly with Ward; therefore, summary judgment is proper. See Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 474 (1991).

The court rejects Ward’s further argument that Costello’s fiduciary duty arises from Addendum A in the First Option Contract, paragraph C, and agrees with Costello that the two men engaged in an arm’s length transaction and that the purpose of paragraph C was to benefit Costello, not to create an “agency relationship.”

The various wrongs which Ward relies on are: (1) fraud, (2) breach of implied covenant of good faith and fair dealing, and (3) violation of the regulation designed to protect public welfare.

Ward’s reliance upon the case of Jet Line Services, Inc. v. American Employers Ins. Co., 404 Mass. 706, 716 (1989), for the proposition that a violation of c. 93A is an independent cause of action is inapposite.

The question of whether a private individual’s participation in an isolated transaction takes place in a business context is for a factfinder to decide after analyzing several relevant factors. See Begelfer v. Najarian, 381 Mass. at 191. The following factors are considered: (1) the nature of the transaction, (2) the character of the parties involved, (3) the activities engaged in by the parties, (4) whether similar transactions have been undertaken in the past, (5) whether the transaction is motivated by business or personal reasons (as in the sale of a home), and (6) and whether the participant played an active part in the transaction. Id.